PETRA MARTINEZ
28029 CAMINO DE CHAMISAL
SALINAS, CA. 93908

**FILED**

AUG 12 2009

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
S. HANS DEPUTY

## SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## MONTEREY COUNTY (UNLIMITED CIVIL JURISDICTION)

| | |
|---|---|
| Petra A. Martinez, | Case No.: M100410 |
| Plaintiff, | **Exhibit A** |
| vs. | Property Description |
| America's Wholesale Lender, | |
| Countrywide/Bank of America, | |
| Recon Trust/MERS, AND DOES 1-100, | |
| Defendant | |

Petra A. Martinez

THENCE, LEAVING SAID BOUNDARY

(10) N. 64° 00' W., 197.10 FEET; THENCE

(11) NORTHWESTERLY, 60.04 FEET, ALONG THE ARC OF A CURVE TO THE LEFT WITH A RADIUS OF 120 FEET, THROUGH A CENTRAL ANGLE OF 28° 40' (LONG CHORD BEARS N. 78° 20' W., 59.42 FEET); THENCE

(12) S. 87° 20' W., 143.00 FEET; THENCE

(13) WESTERLY, 91.11 FEET, ALONG THE ARC OF A CURVE TO THE LEFT WITH RADIUS OF 870 FEET, THROUGH A CENTRAL ANGLE OF 6° 00' (LONG CHORD BEARS S. 84° 20' W., 91.06 FEET); THENCE

(14) S. 81° 20' W., 114.00 FEET; THENCE

(15) WESTERLY, 126.45 FEET, ALONG THE ARC OF A CURVE TO THE RIGHT WITH RADIUS OF 230 FEET, THROUGH A CENTRAL ANGLE OF 31° 30' (LONG CHORD BEARS N. 82° 55' W., 124.86 FEET); THENCE

(16) N. 67° 10' W., 30.65 FEET, TO A POINT ON THE SOUTHEASTERLY LINE OF ROBLEY ROAD; THENCE FOLLOWING SAID LINE

(17) NORTHEASTERLY, 54.5 FEET, ALONG THE ARC OF A NON-TANGENT CURVE TO THE RIGHT, THE CENTER OF WHICH BEARS S. 61° 37' 45" E., 280.00 FEET, THROUGH A CENTRAL ANGLE OF 11° 03' 35" (LONG CHORD BEARS N. 33° 54' 02" E., 53.96 FEET), TO THE POINT OF BEGINNING.

PARCEL III:

A NON-EXCLUSIVE EASEMENT, RIGHT OF WAY, AND RIGHT ON, OVER, UNDER, ACROSS AND THROUGH THE FOLLOWING DESCRIBED PROPERTY FOR PEDESTRIAN AND VEHICULAR ACCESS, INGRESS AND EGRESS AND FOR THE PLACEMENT, INSTALLATION, CONSTRUCTIONS, USE, OPERATION, MAINTENANCE, REPAIR AND REPLACEMENT OF SUCH WORKS OR IMPROVEMENTS THEREON AS MAY BE NECESSARY, USEFUL OR CONVENIENT TO FURTHER OR TO EXPEDITE THE USE OR UTILIZATION OF THE FOLLOWING DESCRIBED PROPERTY FOR SUCH PURPOSES OF ACCESS, INGRESS AND EGRESS INCLUDING THE RIGHT TO CONSTRUCT, PLACE, INSTALL, USE, OPERATE, MAINTAIN, REPAIR, AND REPLACE DRAINAGE, WATER, SEWER, ELECTRICAL, GAS, CABLE, COMMUNICATION AND OTHER UTILITY LINES OR FACILITIES AND ANY APPURTENANCES THERETO, SAID EASEMENT TO BE RETAINED BY AND INURE TO THE BENEFIT OF GRANTEE, ITS SUCCESSORS AND ASSIGNS AND SHALL RUN WITH AND BENEFIT ANY PARCEL OF LAND OR PART THEREOF NOW OWNED BY GRANTEE WHICH LIES ADJACENT THERETO, SAID EASEMENT BEING ON PROPERTY DESCRIBED AS FOLLOWS:

BEING A PART OF PARCELS, 2, 3 AND 4 OF THAT CERTAIN MAP FILED IN VOLUME 3 OF PARCEL MAPS, AT PAGE 81, MONTEREY COUNTY RECORDS, AND BEING A STRIP OF LAND 60.00 FEET IN WIDTH, 30.00 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE:

BEGINNING IN THE WESTERN BOUNDARY OF SAID PARCEL 2 FROM WHICH A 1 INCH IRON PIPE "RCE 1215" AT THE SOUTHEASTERN CORNER FOR THAT CERTAIN 2.915 AC. NET PARCEL SHOWN ON THE MAP ENTITLED, "RECORD OF SURVEY OF 3.000 AC. TRACT IN U.S. LOT 4, SEC. 9, T. 16 S., R. 2 E., M.D.B. & M." FILED IN VOLUME X-2 OF SURVEYS AT PAGE 32, MONTEREY COUNTY RECORDS, BEARS ALONG WESTERN BOUNDARY SOUTH 1° 01' EAST 23.56 FEET DISTANT THENCE FROM SAID POINT OF BEGINNING SOUTH 61° 58' EAST, 102.83 FEET TO THE BEGINNING

OF A TANGENT CURVE; THENCE SOUTHEASTERLY CURVING TO THE LEFT WITH A RADIUS OF 800.00 FEET THROUGH A CENTRAL ANGLE OF 16° 02' FOR A DISTANCE OF 223.87 FEET; THENCE SOUTH 78° 00' EAST, 104.75 FEET TO THE BEGINNING OF A TANGENT CURVE; THENCE SOUTHEASTERLY CURVING TO THE RIGHT WITH A RADIUS OF 185.00 FEET THROUGH A CENTRAL ANGLE OF 45° 44' FOR A DISTANCE OF 147.67 FEET; THENCE SOUTH 32° 16' EAST, 45.64 FEET TO THE BEGINNING OF A TANGENT CURVE; THENCE EASTERLY CURVING TO THE LEFT WITH A RADIUS OF 175.00 FEET, THROUGH A CENTRAL ANGLE OF 72° 30' A DISTANCE OF 221.41 FEET; THENCE NORTH 75° 14' EAST 133.43 FEET TO THE BEGINNING A TANGENT CURVE; THENCE NORTHERLY CURVING TO THE LEFT WITH A RADIUS OF 150.00 FEET THROUGH A CENTRAL ANGLE OF 72° 38', FOR A DISTANCE OF 190.15 FEET, THENCE NORTH 2° 36' EAST, 44.30 FEET TO THE BEGINNING OF A TANGENT CURVE; THENCE NORTHEASTERLY CURVING TO THE RIGHT WITH A RADIUS OF 200 FEET A DISTANCE OF 48 FEET MORE OR LESS TO THE NORTHEASTERN BOUNDARY OF SAID PARCEL 4.

TOGETHER WITH SLOPE EASEMENTS AS REQUIRED FOR CUT AND FILL PURPOSES FOR THE PROPOSED ROAD CONSTRUCTION.

EXCEPTING THEREFROM THAT PORTION THEREOF LYING WITHIN PARCEL B, AS SAID PARCEL IS SHOWN AND SO DESIGNATED ON PARCEL MAP FILED DECEMBER 5, 1985 IN BOOK 16 OF PARCEL MAPS AT PAGE 117, MONTEREY COUNTY RECORDS.

PARCEL IV:

AN EASEMENT 8 FEET WIDE, FOR ACCESS, UTILITIES AND INCIDENTAL PURPOSES, SITUATE IN SECTION 9, T. 16 S., R. 2 E., M.D.B.M., MONTEREY COUNTY, CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY CORNER OF PARCEL 2, AS SAID PARCEL IS SHOWN AND DESIGNATED UPON THAT CERTAIN PARCEL MAP FILED DECEMBER 13, 1972 IN VOLUME 3 OF PARCEL MAPS AT PAGE 81, RECORDS OF MONTEREY COUNTY, CALIFORNIA, AND RUNNING ALONG THE SOUTHEASTERLY LINE OF SAID PARCEL.

1) S. 26° 34' 15" W., 341.92 FEET TO AN ANGLE POINT IN SAID LINE; THENCE CONTINUING ALONG SAID LINE

2) S. 49° 34' 45" W., 20.47 FEET; THENCE LEAVING SAID LINE

3) N. 26° 34' 15" E., 361.81 FEET TO THE NORTHEASTERLY LINE OF SAID PARCEL; THENCE ALONG SAID LINE

4) S. 60° 25' E., 8.01 FEET TO THE POINT OF BEGINNING.

PARCEL V:

AN UNDIVIDED 1/30TH INTEREST IN AND TO THAT CERTAIN WATER SYSTEMS DESIGNATED IN THE DOCUMENT ENTITLED "CHAMISAL WATER ASSOCIATION, RECORDED JUNE 28, 1979 IN REEL 1341, PAGE 572 MONTEREY COUNTY RECORDS, AS DESCRIBED IN THE DEED FROM CHAMISAL TENNIS CLUB, ET AL, RECORDED NOVEMBER 28, 1989 IN REEL 2438, PAGE 124, OFFICIAL RECORDS.

APN No: 416-321-016-000

# END OF DOCUMENT

PETRA MARTINEZ
25339 CAMINO DE CHAMISAL
SALINAS, CA 93908



FILED

AUG 12 2009

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
S. HANS    DEPUTY

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

MONTEREY COUNTY (UNLIMITED CIVIL JURISDICTION)

| | |
|---|---|
| Petra A. Martinez, | Case No.: M100410 |
|     Plaintiff, | **Exhibit B** |
| vs. | Deed of Trust |
| America's Wholesale Lender, | |
| Countrywide/Bank of America, | |
| Recon Trust/MERS, AND DOES 1-100, | |
|     Defendant | |

Petra A. Martinez

FNT 716299
Recording Requested By:
K. POCHY

Stephen L. Vagnini                CRMARIA
Monterey County Recorder          1/20/2006
Recorded at the request of        8:00:00
**Fidelity Title**

DOCUMENT: **2006006030**



Titles: 1/ Pages: 27

Fees....   86.00
Taxes...
Other...
AMT PAID   $86.00

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
LISSETTE SEQUEIRA

———————— [Space Above This Line For Recording Data] ————————

05716299                     00012087646601006
[Escrow/Closing #]              [Doc ID #]

# DEED OF TRUST
MIN 1000157-0001487488-3

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

(A) "Security Instrument" means this document, which is dated JANUARY 04, 2006       , together
with all Riders to this document.
(B) "Borrower" is
PETRA MARTINEZ, AND STANLEY ATKINSON

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Page 1 of 16
VMP  -6A(CA) (0207)    CHL (08/05)(d)    VMP Mortgage Solutions, Inc. (800)521-7291
CONV/VA                                                          Form 3005  1/01



* 2 3 9 9 1 *                    * 1 2 0 8 7 6 4 6 6 0 0 0 0 0 1 0 0 6 A *

DOC ID #: 0001208764601006

Borrower's address is

25339 CAMINO DE CHAMISAL, SALINAS, CA 93908

Borrower is the trustor under this Security Instrument.

(C) "Lender" is

AMERICA'S WHOLESALE LENDER

Lender is a CORPORATION

organized and existing under the laws of NEW YORK

Lender's address is

4500 Park Granada MSN# SVB-314, Calabasas, CA 91302-1613

(D) "Trustee" is

CTC REAL ESTATE SERVICES

400 COUNTRYWIDE WAY, MSN SV-88, SIMI VALLEY, CA 93065 , ,

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated   JANUARY 04, 2006     . The Note states that Borrower owes Lender

ONE MILLION FIVE HUNDRED THOUSAND and 00/100

Dollars (U.S. $ 1,500,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   FEBRUARY 01, 2036   .

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii)

DOC ID #: 00012087646601006

conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of MONTEREY

[Type of Recording Jurisdiction]                                   [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 416321016                              which currently has the address of

25339 CAMINO DE CHAMISAL, SALINAS

[Street/City]

California    93908    ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including,

but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

DOC ID #: 00012087646601006

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

DOC ID #: 0001208764601006

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of

DOC ID #: 00012087646601006

paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

DOC ID #: 0001208764601006

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower

DOC ID #: 00012087646601006

shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security

DOC ID #: 0001208764660100G

Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

DOC ID #: 0001208764601006

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

-6A(CA) (0207)     CHL (08/05)          Page 11 of 16                    Form 3005  1/01

DOC ID #: 0001208764660006

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in

DOC ID #: 0001208764660I006

compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

DOC ID #: 00012087646601006

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

DOC ID #: 00012087646601006

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Petra Martinez_ (Seal)
PETRA MARTINEZ                              -Borrower

_Stanley Atkinson_ (Seal)
STANLEY ATKINSON                           -Borrower

_____ (Seal)
                                           -Borrower

_____ (Seal)
                                           -Borrower

DOC ID #: 00012087646601006

State of California

County of _Monterey_ } ss.

On _11/3/06_ before me, _Joan E. Santoro, Notary Public_,
_Pierre Menendez or Stanley Atkinson_ personally appeared

_____

_____

_____

_____, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

JOAN E. SANTORO
Commission # 1340895
Notary Public - California
Monterey County
My Comm. Expires Jan 21, 2008

PETRA MARTINEZ
25339 CAMINO DE CHAMISAL
SALINAS, CA. 93908

FILED

AUG 12 2009

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
BY _____ DEPUTY
S. HANS

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

MONTEREY COUNTY (UNLIMITED CIVIL JURISDICTION)

| | |
|---|---|
| Petra A. Martinez, | Case No.: M 100410 |
| Plaintiff, | **Exhibit C** |
| vs. | • Adjustable Rate Note |
| America's Wholesale Lender, | • Fixed / Adjustable Rate Rider |
| Countrywide/Bank of America, | |
| Recon Trust/MERS, AND DOES 1-100, | |
| Defendant | |

Petra A. Martinez

/

Prepared by: LISSETTE SEQUEIRA

LOAN #: 120876466

# InterestOnly℠ ADJUSTABLE RATE NOTE
(One-Year LIBOR Index (As Published in *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

JANUARY 04, 2006          SACRAMENTO          CALIFORNIA
[Date]                          [City]                    [State]

25339 CAMINO DE CHAMISAL, SALINAS, CA 93908
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 1,500,000.00     (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
AMERICA'S WHOLESALE LENDER
I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.500 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will make a payment on the   first          day of every month, beginning on   MARCH 01, 2006
Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on   FEBRUARY 01, 2036    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

My monthly payment will be in the amount of U.S. $ 8,125.00      before the First Principal and Interest Payment Due Date, and thereafter will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of change in monthly payment.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

CONV
● MULTISTATE Interest Only ADJUSTABLE RATE NOTE - ONE YEAR LIBOR INDEX
2D805-XX (04/03)(d)                    Page 1 of 4                    Initials:_____





LOAN #: 120876466

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of FEBRUARY, 2013 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market (LIBOR), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.500 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.500 %.

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be the first monthly payment date after the first Change Date.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payments unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist of only interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

LOAN #: 120876466

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

LOAN #: 120876466

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
PETRA MARTINEZ                                    -Borrower

_____ (Seal)
                                                  -Borrower

_____ (Seal)
                                                  -Borrower

_____ (Seal)
                                                  -Borrower

*[Sign Original Only]*

Prepared by: LISSETTE SEQUEIRA

**AMERICA'S WHOLESALE LENDER**

DATE:       01/05/2006
BORROWER:   PETRA MARTINEZ
CASE #:
LOAN #:     120876466
PROPERTY ADDRESS: 25339 CAMINO DE CHAMISAL
                  SALINAS, CA 93908

Branch #: 0000931
3201 DANVILLE BLVD, SUITE 177
ALAMO, CA 94507
Phone: (925)552-4740
Br Fax No.: (925)552-7004

## NOTICE TO CLOSING AGENT & BORROWER
### PREPAID INTEREST COLLECTED AT FUNDING

I understand that California law provides that a borrower shall not be required to pay interest on a home loan for a period in excess of one day prior to disbursement of escrow funds. Interest may commence to accrue on the business day immediately preceding the day of escrow disbursement, if (i) the borrower affirmatively requests and the Lender agrees, that the disbursement will occur on a Monday or a day immediately following a holiday and (ii) the Lender discloses (A) the amount of additional per diem interest charged to facilitate disbursement on a Monday or the day following a holiday, as the case may be, and (B) that it may be possible to avoid the additional per diem interest by disbursing the loan proceeds on a day immediately following a business day.

My initials here indicate that I do not request or approve any request made on my behalf that escrow disbursement occurs on a Monday or a day immediately following a holiday, as the case may be. _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

My signature below indicates that I wish the Lender to comply with a request made by me or on my behalf to close on a Monday or a day immediately following a holiday. I understand and agree that there will be an additional per diem interest charge as follows:

If disbursement of loan proceeds occurs on a Monday and the preceding Friday is not a bank holiday, there will be an additional two-day per diem interest charge of $ 534.24

If disbursement of loan proceeds occurs on a day immediately following a bank holiday, the additional per diem interest charge will depend on the day of the week on which the bank holiday falls:

- An additional three-day per diem interest charge of $ 801.36        will be due if the bank holiday falls on a Monday or Friday.

- An additional one-day per diem interest charge of $ 267.12        will be due if the bank holiday falls on a Tuesday, Wednesday or Thursday.

I/ We understand that it may be possible to avoid this additional per diem interest charge by disbursing the loan proceeds on a day immediately following a business day.

PETRA MARTINEZ

_____

_____

_____

FHA/VA/CONV
● Notice to Closing Agent and Borrower (Prepaid Interest Collected at Funding)
2D640-CA (08/04)(d)





Prepared by: LISSETTE SEQUEIRA      AMERICA'S WHOLESALE LENDER

DATE:    01/05/2006
BORROWER: PETRA MARTINEZ
CASE #:
LOAN #:    120876466
PROPERTY ADDRESS: 25339 CAMINO DE CHAMISAL
SALINAS, CA 93908

Branch #: 0000931
3201 DANVILLE BLVD, SUITE 177
ALAMO, CA 94507
Phone: (925)552-4740
Br Fax No.: (925)552-7004

## 5-2-5 CAP STRUCTURE "INTEREST FIRST/INTEREST ONLY" FIXED PERIOD LIBOR ARMS

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. Information about our other ARM programs will be provided upon request.

### HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED

- After the first five, seven or ten years of your loan, as applicable, your interest rate will be based on an index rate plus a margin. Please ask us for our current interest rates and margins.
- The "index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal.
- Your initial interest rate is not based on the index used to make later adjustments. If the initial interest rate is below the sum of the then-current index plus margin (the "fully indexed rate"), then the initial interest rate will be a "discounted" interest rate. If the initial interest rate is above the fully indexed rate, then it will be a "premium" interest rate. Please ask us for the amount of our current interest rate discounts and premiums.
- For the first five, seven or ten years of your loan, as applicable, your payment will be based on the interest rate, loan balance, and remaining loan term.

|  | 5/1 ARM | 7/1 ARM | 10/1 ARM |
|---|---|---|---|
| **HOW YOUR INTEREST RATE CAN CHANGE** | | | |
| Your interest rate can change: | After 5 years and annually thereafter. | After 7 years and annually thereafter. | After 10 years and annually thereafter. |
| Each time your interest rate changes, the new interest rate will equal the sum of the index plus the margin, subject to the following limits: | • Your interest rate will be rounded to the nearest 1/8%. <br>• On the first change date, your interest rate can increase or decrease by 5.0%. <br>• On each subsequent change date, your interest rate will not increase by more than 2.0%. <br>• Your interest rate will not increase by more than 5.0% over the life of your loan. | • Your interest rate will be rounded to the nearest 1/8%. <br>• On the first change date, your interest rate can increase or decrease by 5.0%. <br>• On each subsequent change date, your interest rate will not increase by more than 2%. | • Your interest rate will be rounded to the nearest 1/8%. <br>• Your interest rate will not increase by more than 5% over the life of your loan. <br>• On the first change date, your interest rate can increase or decrease by 5.0%. <br>• On each subsequent change date, your interest rate will not increase by more than 2%. |
| **HOW YOUR PAYMENT CAN CHANGE** | | | |
| Your monthly payments will cover interest only: | For the first 5 years of your loan. | For the first 7 years of your loan. | For the first 10 years of your loan. |
| If you make voluntary principal payments during the interest only period: | Your required interest only payment will be reduced to reflect the decrease in your loan amount. | | |
| Your monthly payments can change: | Each time the interest rate changes and can increase or decrease substantially based on changes in the interest rate. | | |
| For the first 5, 7 or 10 years of your loan, as applicable, your regular monthly payments will not reduce your loan balance. After this initial interest-only period, your monthly payments will begin to reduce your loan balance. This means that your payments could increase substantially when the interest-only period ends, even if your interest rate stays the same or goes down. | | | |
| You will be notified in writing: | At least 25, but no more than 120 days, before the due date of a payment at a new level. This notice will contain information about the index, your interest rates, payment amount, and loan balance. | | |

The examples below illustrate interest rate and payment changes based on a $10,000, 30-year loan using an initial interest rate in effect on the last business day of January , 2005 and assuming the maximum periodic increase in rates and payments.

### EXAMPLE WITH DISCOUNTED INITIAL RATE (FULLY INDEXED RATE DETERMINED)

|  | 5/1 ARM | 7/1 ARM | 10/1 ARM |
|---|---|---|---|
| Initial Interest Rate | Not Available % | 5.250 % | 5.125 % |
| Maximum Interest Rate | Not Available % | 10.250 % | 10.125 % |
| First Year Payment | $ Not Available | $ 43.75 | $ 42.71 |
| Maximum payment | $ Not Available in the 6th year | $ 94.45 in the 8th year | $ 97.33 in the 11th year |

### EXAMPLE WITH PREMIUM INITIAL RATE (FULLY INDEXED RATE DETERMINED)

|  | 5/1 ARM | 7/1 ARM | 10/1 ARM |
|---|---|---|---|
| Initial Interest Rate | 5.875 % | 6.125 % | 6.000 % |
| Maximum Interest Rate | 10.875 % | 11.125 % | 11.000 % |
| First Year Payment | $ 48.96 | $ 51.04 | $ 50.00 |
| Maximum payment | $ 97.11 in the 6th year | $ 100.59 in the 8th year | $ 103.22 in the 11th year |

Note: To see what your payment would be, divide your mortgage amount by $10,000; then multiply the monthly payment by that amount. For example, the monthly payment for a $60,000 5/1 ARM with a premium interest rate would be: $60,000 / $10,000 = 6

6 x $ 48.96 = $293.76

---

PETRA MARTINEZ          Date                              Date
Applicant

                          Date                              Date
Applicant                                 Applicant

Conv
• Program Disclosure - Interest First/Interest Only Fixed LIBOR ARM
2D806-US (09/05)(d)





Prepared by: LISSETTE SEQUEIRA

**AMERICA'S WHOLESALE LENDER**

DATE: 01/05/2006
BORROWER: PETRA MARTINEZ
CASE #:
LOAN #: 120876466
PROPERTY ADDRESS: 25339 CAMINO DE CHAMISAL
SALINAS, CA 93908

Branch #: 0000931
3201 DANVILLE BLVD, SUITE 177
ALAMO, CA 94507
Phone: (925)552-6740
Br Fax No.: (925)552-7004

### INTEREST-ONLY FEATURE DISCLOSURE

This disclosure contains important information about your loan and the interest-only feature. You should read it carefully and keep a copy for your records.

You have applied for a loan that provides for monthly payments of interest-only during the first 7 years, followed by monthly payments of principal and interest for the remaining years of the loan. The interest-only feature on your loan provides you with the following benefits:

• Lower monthly payments during the first 7 years of your loan.
• Potential tax benefits from extra mortgage interest deductions on your loan. Ask your tax advisor for advice on tax implications for you.

During the interest-only period, the monthly payment will not reduce the principal balance that is outstanding on your loan. After the interest-only period, your monthly payment will be higher during the remaining 23 year term of the loan to cover principal and interest. Your Amortization Schedule shows the change in your monthly payment after the interest-only period. With the interest-only feature, you will pay more mortgage interest over the life of the loan than you would with a 30-year fixed rate mortgage.

If your loan includes mortgage insurance, the interest-only feature may delay the date on which you are eligible to cancel your mortgage insurance.

If you make a partial prepayment during the period when your monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term in which the payments consist only of interest. Prepayment amounts received by the 20th of the month will decrease the payment due the next month. Prepayment amounts received after the 20th will affect the payment due the second month following receipt of the prepayment.

If a partial prepayment is made during the period when your payments consist of principal and interest, the amount of your monthly payment will not decrease; however, the principal and the interest required under the Note will be paid prior to Maturity Date.

I acknowledge that I have read and understand the information about the interest-only feature and voluntarily elect this feature.


| Applicant | Date | Applicant | Date |


| Applicant | Date | Applicant | Date |


CONV
• Interest-Only ARM Feature Disclosure
2D793-US (10/02)(d)





Assessor's Parcel Number:

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.


MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Prepared By:
LISSETTE SEQUEIRA

Recording Requested By:


—————————————— [Space Above This Line For Recording Data] ——————————————

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

05716299            00012087646601006
[Escrow/Closing #]            [Doc ID #]

CONV
● MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
  INTEREST ONLY
1U796-XX (06/04)(d)            Page 1 of 5            Initials: *PM/SA*

*23991*            *12087646600001U796*

DOC ID #: 00012087646601006

THIS FIXED/ADJUSTABLE RATE RIDER is made this FOURTH         day of
JANUARY, 2006     , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to
AMERICA'S WHOLESALE LENDER

("Lender") of the same date and covering the property described in the Security Instrument and
located at:

25339 CAMINO DE CHAMISAL
SALINAS, CA 93908
[Property Address]

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST
RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE
AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT
ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:
**A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial fixed interest rate of      6.500 %. The Note also provides
for a change in the initial fixed rate to an adjustable interest rate, as follows:
**4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The initial fixed interest rate I will pay will change to an adjustable interest rate on the
first       day of FEBRUARY, 2013     , and the adjustable interest rate I will pay
may change on that day every 12th month thereafter. The date on which my initial fixed interest rate
changes to an adjustable interest rate, and each date on which my adjustable interest rate could
change, is called a "Change Date."
**(B) The Index**
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for one year U.S. dollar-denominated deposits in the
London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure
available as of the date 45 days before each Change Date is called the "Current Index".
If the Index is no longer available, the Note Holder will choose a new Index that is based upon
comparable information. The Note Holder will give me notice of this choice.
**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO & ONE-QUARTER            percentage points (     2.250 %) to the Current Index.
the Note Holder will then round the result of this addition to the nearest one-eighth of one percentage
point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new
interest rate until the next Change Date.

CONV
* MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
  INTEREST ONLY
1U796-XX (06/04)                    Page 2 of 5                     Initials: *[initials]*

DOC ID #: 00012087646601006

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.500 % or less than   2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

CONV
● MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
1U796-XX (06/04)                       Page 3 of 5                       Initials: _PM/BJ_

DOC ID #: 0001208764601006

2. When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

DOC ID #: 00012087646601006

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
PETRA MARTINEZ                           -Borrower

_____ (Seal)
STANLEY ATKINSON                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

CONV
MULTISTATE FIXED/ADJUSTABLE RATE RIDER - WSJ One-Year LIBOR - Single Family
INTEREST ONLY
1U796-XX (06/04)                    Page 5 of 5

PETRA MARTINEZ
25339 CAMINO DE CHAMISAl
SALINAS, CA. 93908

FILED

AUG 12 2009

CONNIE MAZZEI
CLERK OF THE SUPERIOR COURT
BY _____ DEPUTY
S. HANS

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

MONTEREY COUNTY (UNLIMITED CIVIL JURISDICTION)

| | |
|---|---|
| Petra A. Martinez, | Case No.: M100410 |
| Plaintiff, | **Exhibit D** |
| vs. | |
| America's Wholesale Lender, | |
| Countrywide/Bank of America, | |
| Recon Trust/MERS, AND DOES 1-100, | |
| Defendant | |

- Martinez Securitization Flow Chart [1 page]
- Traunch (#CWMBS 2006-HYB4), containing Martinez loan [1 page]
- Prospectus of CHL Mortgage Pass-Through Trust 2006-HYB4 [268 pages]
- Request to Recon Trust for analysis of assignments [2 PAGES]

Petra A. Martinez



**MARTINEZ-ATKINSON SECURITIZATION FLOW CHART**

CHL Mortgage Pass-Through Trust 2006-HYB4

**ARROW LEGEND**

Purple - Mortgage Documents
Blue - Securities Certificates
Orange - Investor Funds
Green - Borrower Funds



Truth In Lending Audit & Recovery Services, LLC
Copyright 2009

# Mortgage Loan Schedule
## Martinez - Atkinson Securitization
## CHL Mortgage Pass-Through Trust 2006-HYB4

| # | Position | Curr Amt | Orig Amt | Note Rate | Gross HTV | Score | Age | MTM | Amort Type | Index | MTR | 950 | Delnq Days | Spcl Svc | ZipCode | MSA |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | FFFFFFFFF99999966CCCCCC | 1,968,288 | 2,000,000 | 6.63 | 64.5 | 685 | 40 | 330 | ARM | LIBOR6MO | 44 | SC | 0 Days | | 29928 | |
| 3 | FFFFFFFF999999966CCCCCC | 1,799,600 | 1,800,000 | 5.38 | 78.3 | 714 | 38 | 321 | ARM | LIBOR12MO | 21 | CA | | | 91311 | Oxnard-Thousand Oaks-Ventura, CA |
| 4 | 9999966666663330CCCCCC | 1,628,000 | 1,628,000 | 5.88 | 57.9 | 727 | 39 | 321 | ARM | LIBOR6MO | 45 | MA | 0 Days | | 2420 | Boston-Cambridge-Quincy, MA-NH |
| 5 | CCCCCCCCCCCCCCCCCCCCCC | 1,382,825 | 1,388,200 | 6.5 | 65 | 760 | 40 | 330 | ARM | LIBOR6MO | 45 | CA | 0 Days | | 94941 | San Francisco-Oakland-Fremont, CA |
| 6 | CCCCCCCCCCCCCCCCCCCCCC | 998,973 | 1,000,000 | 6.88 | 68.1 | 686 | 39 | 321 | ARM | LIBOR6MO | 45 | | 90 Days | | | |
| 7 | CCCCCCCCCCCCCCCCCCCCCC | 998,675 | 1,000,000 | 6.88 | 69.9 | 659 | 39 | 321 | ARM | LIBOR6MO | 44 | ID | 0 Days | | 83616 | Boise City-Nampa, ID |
| 8 | CCCCCCCCCCCCCCCCCCCCCC | 990,163 | 1,000,000 | 5.88 | 58.9 | 699 | 39 | 322 | ARM | LIBOR6MO | 44 | CA | 0 Days | | 93460 | Santa Barbara-Santa Maria-Goleta, CA |
| 9 | FF9999966666663330CCCCCC | 977,519 | 982,500 | 4.88 | 75.6 | 725 | 39 | 320 | ARM | LIBOR6MO | 4 | MO | 90 Days | | 64152 | Kansas City, MO-KS |
| 10 | BBBBBBFFFF99989CCCCCCCC | 960,000 | 960,000 | 6.63 | 75 | 637 | 40 | 320 | ARM | LIBOR6MO | 44 | FL | | Foreclosure | 33129 | Miami-Fort Lauderdale-Pompano Beach, FL |
| 11 | CCCCCCCCCCCCCCCCCCCCCC | 959,448 | 960,000 | 6.75 | 80 | 711 | 39 | 321 | ARM | LIBOR6MO | 44 | GA | 0 Days | | 30097 | Atlanta-Sandy Springs-Marietta, GA |
| 12 | CCCCCCCCCCCCCCCCCCCCCC | 958,742 | 960,000 | 5.13 | 80 | 747 | 41 | 319 | ARM | LIBOR6MO | 44 | | Bankruptcy | | 91360 | Oxnard-Thousand Oaks-Ventura, CA |
| 13 | B9630CCCCCCCCCCCCCCCCC | 885,606 | 910,000 | 5.38 | 65 | 717 | 39 | 321 | ARM | LIBOR6MO | 3 | AZ | 0 Days | | 86330 | Prescott, AZ |
| 14 | CCCCCCCCCCCCCCCCCCCCCC | 903,906 | 904,000 | 5.38 | 80 | 747 | 39 | 321 | ARM | LIBOR6MO | 44 | FL | 0 Days | | 34242 | Sarasota-Bradenton-Venice, FL |
| 15 | CCCCCCCCCCCCCCCCCCCCCC | 901,356 | 903,000 | 5.75 | 74.9 | 680 | 39 | 321 | ARM | LIBOR6MO | 45 | CA | Bankruptcy | | 91935 | San Diego-Carlsbad-San Marcos, CA |
| 16 | 6630CCCCCCCCCCCCCCCCCC | 879,757 | 880,001 | 4.25 | 58.7 | 644 | 40 | 320 | ARM | LIBOR6MO | 4 | DC | 0 Days | | 20833 | Washington-Arlington-Alexandria, DC-VA-MD-WV |
| 17 | CCCCCCCCCCCCCCCCCCCCCC | 841,562 | 862,500 | 5.5 | 75 | 717 | 39 | 322 | ARM | LIBOR6MO | 45 | CA | 0 Days | | 91910 | Sacramento--Arden-Arcade--Roseville, CA |
| 18 | CCCCCCCCCCCCCCCCCCCCCC | 855,000 | 855,000 | 6.63 | 75 | 719 | 40 | 320 | ARM | LIBOR6MO | 44 | AR | 60 Days | | 72223 | Little Rock-North Little Rock-Conway, AR |
| 19 | CCCCCCCCCCCCCCCCCCCCCC | 841,000 | 841,000 | 6 | 76.4 | 711 | 39 | 321 | ARM | LIBOR6MO | 43 | CA | | Foreclosure | 95120 | San Jose-Sunnyvale-Santa Clara, CA |
| 20 | CCCCCCCCCS9S9S3CCCCCCC | 813,614 | 814,400 | 7 | 80 | 674 | 41 | 319 | ARM | LIBOR6MO | 44 | CA | 0 Days | | 95709 | Sacramento--Arden-Arcade--Roseville, CA |
| 21 | FFFFFFFFFF99963CCCCCCC | 799,782 | 799,999 | 6.13 | 80 | 755 | 40 | 320 | ARM | LIBOR6MO | 44 | MN | 0 Days | | 55305 | Minneapolis-St. Paul-Bloomington, MN-WI |
| 22 | RRF963CCCCCCCCCCCCCCCC | 797,652 | 800,001 | 5.38 | 79.2 | 736 | 39 | 321 | ARM | LIBOR6MO | 3 | CA | 0 Days | | 33070 | |
| 23 | RRRRRRRRRFFFF9963CCCCC | 797,592 | 800,000 | 4.25 | 63.8 | 754 | 39 | 321 | ARM | LIBOR6MO | 45 | CA | 0 Days | | 91207 | Los Angeles-Long Beach-Santa Ana, CA |
| 24 | 745,297 | 763,954 | 800,000 | 6.13 | 74.4 | 634 | 41 | 319 | ARM | LIBOR6MO | 44 | CA | 0 Days | | 93455 | Santa Barbara-Santa Maria-Goleta, CA |
| 25 | CCCCCCCCCCCCCCCCCCCCCC | 745,477 | 784,000 | 6.13 | 80 | 756 | 40 | 320 | ARM | LIBOR6MO | 44 | CA | 0 Days | | 94590 | Vallejo-Fairfield, CA |
| 27 | CCCCCCCCCCCCCCCCCCCCCC | 745,297 | 745,000 | 4.38 | 79 | 674 | 40 | 320 | ARM | LIBOR6MO | 44 | MI | 0 Days | | 48167 | Detroit-Warren-Livonia, MI |
| 28 | CCCCCCCCCCCCCCCCCCCCCC | 736,000 | 736,000 | 7.13 | 80 | 710 | 41 | 319 | ARM | LIBOR6MO | 43 | NJ | REO | | 94060 | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| 29 | CCCCCCCCCCCCCCCCCCCCCC | 718,184 | 720,000 | 5.38 | 80 | 676 | 40 | 314 | ARM | LIBOR6MO | 22 | CA | REO | | 94566 | San Jose-Sunnyvale-Santa Clara, CA |
| 30 | CCCCCCCCC3C3CCCCCCCCCC | 694,317 | 700,000 | 6.13 | 80 | 725 | 38 | 322 | ARM | LIBOR6MO | 45 | GA | 0 Days | | 30040 | Atlanta-Sandy Springs-Marietta, GA |
| 31 | CCCCCCCCCCCCCCCCCCCCCC | 680,054 | 708,000 | 6.13 | 80 | 765 | 41 | 319 | ARM | LIBOR6MO | 22 | CA | 0 Days | | 92009 | San Diego-Carlsbad-San Marcos, CA |
| 32 | 3CC99963C3C3CCCCCCCCCC | 697,985 | 697,000 | 2.75 | 75.8 | 673 | 39 | 321 | ARM | LIBOR6MO | 45 | CA | 60 Days | | 90064 | Los Angeles-Long Beach-Santa Ana, CA |
| 34 | F963CCCCCCCCCCCCCCCCCC | 659,422 | 660,000 | 6.38 | 64 | 655 | 40 | 320 | ARM | LIBOR6MO | 20 | CA | 30 Days | | 95838 | Sacramento--Arden-Arcade--Roseville, CA |
| 37 | CCCCCCCCCCCCCCCCCCCCCC | 683,864 | 683,864 | 6.13 | 80 | 636 | 40 | 320 | ARM | LIBOR6MO | -3 | CA | | Foreclosure | 94558 | San Francisco-Oakland-Fremont, CA |
| 36 | FF99963CCCCCCCCCCCCCCC | 665,000 | 665,000 | 5.88 | 76.2 | 670 | 39 | 321 | ARM | LIBOR6MO | 22 | CA | 0 Days | | 91737 | Riverside-San Bernardino-Ontario, CA |
| 39 | CCC99963CCCCCCCCCCCCCC | 651,269 | 880,000 | 4.35 | 80 | 675 | 39 | 321 | ARM | LIBOR6MO | 44 | CA | 0 Days | | 90045 | Los Angeles-Long Beach-Santa Ana, CA |
| 40 | 66333339CCCCCCCCCCCCCC | 650,000 | 650,000 | 6.38 | 75.6 | 744 | 38 | 322 | ARM | LIBOR6MO | 20 | AZ | 0 Days | | 86305 | Prescott, AZ |
| 41 | CCCCCCCCCCCCCCCCCCCCCC | 650,000 | 650,000 | 6.38 | 78.8 | 765 | 40 | 320 | ARM | LIBOR6MO | 44 | NY | | Foreclosure | 11372 | New York-Northern New Jersey-Long Island, NY-NJ-PA |
| 42 | CCCCCCCCCCCCCCCCCCCCCC | 650,000 | 660,000 | 7.25 | 77.5 | 756 | 38 | 322 | ARM | LIBOR6MO | 20 | CA | | Foreclosure | 93030 | Oxnard-Thousand Oaks-Ventura, CA |
| 43 | 653CCCCCCCC3CCCCCCCCCC | 649,593 | 650,000 | 5.13 | 72.2 | 719 | 41 | 319 | ARM | LIBOR6MO | 44 | CA | 0 Days | | 91355 | Los Angeles-Long Beach-Santa Ana, CA |
| 44 | 19963CCCCCCCCCCCCCCCCC | 643,823 | 649,000 | 5.25 | 76.5 | 731 | 40 | 317 | ARM | LIBOR6MO | 20 | MD | 0 Days | | 21042 | Baltimore-Towson, MD |
| 45 | CCCCCCCCCCCCCCCCCCCCCC | 648,750 | 648,750 | 6.5 | 73.9 | 675 | 39 | 321 | ARM | LIBOR6MO | 44 | WA | 60 Days | | 98102 | Seattle-Tacoma-Bellevue, WA |
| 46 | FFFFBB99963CCCCCCCCCCC | 645,942 | 646,642 | 4.5 | 75.5 | 727 | 39 | 321 | ARM | LIBORMO | 20 | MI | | Foreclosure | 48302 | Detroit-Warren-Livonia, MI |
| 47 | 6333333CCCCCCCCCCCCCCC | 823,598 | 650,000 | 6.38 | 73.9 | 677 | 40 | 320 | ARM | LIBOR6MO | -7 | MI | | | 49009 | Kalamazoo-Portage, MI |
| 49 | CCCCCCCCCCCCCCCCCCCCCC | 645,599 | 649,000 | 6.4 | 79.5 | 719 | 39 | 321 | ARM | LIBOR6MO | 45 | CA | 60 Days | | 92107 | San Diego-Carlsbad-San Marcos, CA |
| 54 | CCCCCCCCCCCCCCCCCCCCCC | 648,750 | 648,750 | 6.63 | 79.9 | 675 | 39 | 321 | ARM | LIBOR6MO | 45 | CA | | | 95355 | Modesto, CA |
| 56 | CCCCCCCCCCCCCCCCCCCCCC | 647,900 | 648,000 | 6.63 | 79.4 | 677 | 40 | 321 | ARM | LIBOR6MO | 45 | CA | 90 Days | | 92115 | San Diego-Carlsbad-San Marcos, CA |
| 47 | CCCCCCCCCCCCCCCCCCCCCC | 645,547 | 645,587 | 6.5 | 90 | 682 | 39 | 321 | ARM | LIBOR6MO | 45 | NV | 0 Days | | 89131 | Las Vegas-Paradise, NV |



**TRUTH IN LENDING AUDIT &
RECOVERY SERVICES, LLC**

Post Office Box 2760
30 Main Street, Rear
Orleans, MA 02653

Tel (508) 255-8829 · Fax (508) 255-9626
Marie.McDonnell@truthinlending.net

May 12, 2009

*To:* RECONTRUST COMPANY, N.A.    *From:* Marie McDonnell
*At:* Telephone (800) 281-8219    *At:* Telephone (508) 255-8829
   Fax (805) 577-4562       Fax (508) 255-9626

RE: PETRA MARTINEZ & STANLEY ATKINSON

25339 Camino De Chamisal, Salinas, CA, 93908

*Copy:*                     *Pages:*   3

# URGENT

## Notice of Trustee's Sale – 5/20/2009 at 10:00 AM

Dear Sir/Madam:

On behalf of Petra Martinez and Stanley Atkinson, I am writing to inform you that my audit of the subject loan indicates that the above referenced Trustee's Sale is improper because it has not been brought in the name of the "real party in interest." (Authorizations Attached Hereto)

Please cancel this sale immediately and fax me all Assignments of the Deed of Trust showing how the Martinez/Atkinson mortgage obligation has been conveyed from the originating lender, America's Wholesale Lender, to the Bank of New York, as Trustee for the Certificate Holders of CHL Mortgage Pass-Through Trust 2006-HYB4.

I need to have this information by close of business tomorrow, May 13, 2009. TIME IS OF THE ESSENCE.

In addition, I am requesting that you provide me with the name of your attorney so that I can discuss the substantive matters with him/her. Please do not hesitate to contact me with any questions you may have.

Sincerely,

*Marie Mc Donnell*

Marie McDonnell

**PLEASE NOTE**: This is a "Qualified Written Request" pursuant to 24 C.F.R. § 3500.21 and requires your timely response. Request for identity of Holder is made pursuant to 15 USCS § 1641(f)(2).

```
*************** -Comm. Journal- ******************** Date MAY-12-2009 ***** Time 17:56 ********

Mode =  Memory Transmission              Start=MAY-12 17:55     End=MAY-12 17:56

        File No.=498

STN    Comm.   Key Name        Station Name/Email Address/Telephone No.  Pages    Duration
No.

001    OK      ☎               18055774562                              003/003  00:00:32


                                          -THE MORTGAGE COUNSELOR  -

***** DP-C264 ********************* -508-255-9626    - ***** -     508 255 9626- *********
```

TRUTH IN LENDING AUDIT &
RECOVERY SERVICES, LLC
Post Office Box 2760
30 Main Street, Rear
Orleans, MA 02653
Tel (508) 255-8829 · Fax (508) 255-9626
Marie.McDonnell@truthinlending.net

𝓕𝓪𝔁

May 12, 2009

| | |
|---|---|
| To: RECONTRUST COMPANY, N.A. | From: Marie McDonnell |
| At: Telephone (800) 281-8219 | At: Telephone (508) 255-8829 |
| Fax (805) 577-4562 | Fax (508) 255-9626 |

RE: PETRA MARTINEZ & STANLEY ATKINSON
25539 Camino De Chamisal, Salinas, CA, 93908

Copy:                                          Pages:   3

## URGENT

### Notice of Trustee's Sale – 5/20/2009 at 10:00 AM

Dear Sir/Madam:

On behalf of Petra Martinez and Stanley Atkinson, I am writing to inform you that my audit of the subject loan indicates that the above referenced Trustee's Sale is improper because it has not been brought in the name of the "real party in interest." (Authorizations Attached Hereto)

Please cancel this sale immediately and fax me all Assignments of the Deed of Trust showing how the Martinez/Atkinson mortgage obligation has been conveyed from the originating lender, Amstien's Wholesale Lender, to the Bank of New York, as Trustee for the Certificate Holders of CHL Mortgage Pass-Through Trust 2006-HYB4.

I need to have this information by close of business tomorrow, May 13, 2009. TIME IS OF THE ESSENCE.

In addition, I am requesting that you provide me with the name of your attorney so that I can discuss the substantive matters with him/her. Please do not hesitate to contact me with any questions you may have.

Sincerely,

*Marie Mc Donnell*

Marie McDonnell

PLEASE NOTE: This is a "Qualified Written Request" pursuant to 24 C.F.R. § 3500.21 and requires your timely response. Request for identity of Holder is made pursuant to 15 USCS § 1641(f)(2).

PROSPECTUS SUPPLEMENT
(To Prospectus dated March 28, 2006)

# $443,360,100
(Approximate)
## CWMBS, INC.
Depositor



### HOME LOANS
Sponsor and Seller
## Countrywide Home Loans Servicing LP
Master Servicer
## CHL Mortgage Pass-Through Trust 2006-HYB4
Issuing Entity
**Distributions payable monthly, beginning June 20, 2006**

The issuing entity will issue certificates, including the following classes of certificates that are offered pursuant to this prospectus supplement and the accompanying prospectus:

| | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) | | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) |
|---|---|---|---|---|---|
| Class 1-A-1 | $105,092,000 | Variable | Class 3-B | $ 89,444,000 | Variable |
| Class 1-A-2 | $ 11,677,000 | Variable | Class 3-AB | $ 22,933,000 | Variable |
| Class 1-A-IO | $116,769,000(3) | Variable | Class 3-A-IO | $229,335,000(3) | Variable |
| Class 2-A-1 | $ 65,317,000 | Variable | Class A-R | $          100 | Variable |
| Class 2-A-2 | $  7,257,000 | Variable | Class M | $ 12,001,000 | Variable |
| Class 2-A-IO | $ 72,574,000(3) | Variable | Class B-1 | $  7,699,000 | Variable |
| Class 3-A | $116,958,000 | Variable | Class B-2 | $  4,982,000 | Variable |

**Consider carefully the risk factors beginning on page S-18 in this prospectus supplement and on page 2 in the prospectus.**

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWMBS, Inc., Countrywide Home Loans, Inc. or any of their affiliates.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

(1)  This amount is subject to a permitted variance in the aggregate of plus or minus 5%.

(2)  The classes of certificates offered by this prospectus supplement are listed, together with their pass-through rates and their initial ratings, in the tables under "Summary — Description of the Certificates" that begin on page S-6 of this prospectus supplement.

(3)  The Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates are interest only notional amount certificates. The initial notional amounts of the Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates are set forth in the table but are not included in the aggregate certificate balance of all the certificates offered.

This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity. The certificates represent interests in a pool consisting of four loan groups of 30-year conventional, hybrid adjustable rate mortgage loans secured by first liens on one- to four-family residential properties.

Credit enhancement for the offered certificates consists of subordination. The credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for the certificates is described in more detail in this prospectus supplement.

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.**

Countrywide Securities Corporation will offer the classes of certificates listed above (other than the Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates) to the public at varying prices to be determined at the time of sale. The Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates will not be purchased by Countrywide Securities Corporation and are being transferred to Countrywide Home Loans, Inc. as partial consideration on or about May 30, 2006 for the sale of the mortgage loans. *See "Method of Distribution" in this prospectus supplement.* The proceeds to the depositor from the sale of the offered certificates (other than the Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates) are expected to be approximately $446,978,805 plus accrued interest, before deducting expenses.

# Countrywide Securities Corporation

May 26, 2006

## Table of Contents

| Prospectus Supplement | Page |
|---|---|
| Summary | S-3 |
| Summary of Transaction Parties | S-17 |
| Risk Factors | S-18 |
| The Mortgage Pool | S-25 |
| General | S-25 |
| Assignment of the Mortgage Loans | S-92 |
| Underwriting Process | S-93 |
| Servicing of Mortgage Loans | S-97 |
| General | S-97 |
| Countrywide Home Loans Servicing LP | S-97 |
| Countrywide Home Loans | S-98 |
| Mortgage Loan Production | S-99 |
| Loan Servicing | S-99 |
| Collection Procedures | S-100 |
| Servicing Compensation and Payment of Expenses | S-100 |
| Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans | S-101 |
| Advances | S-102 |
| Certain Modifications and Refinancings | S-102 |
| The Issuing Entity | S-102 |
| Static Pool Data | S-103 |
| Description of the Certificates | S-103 |
| General | S-103 |
| Calculation of Class Certificate Balance | S-105 |
| Senior Certificate Groups | S-105 |
| Component Classes | S-105 |
| Subordinated Portions | S-106 |
| Notional Amount Certificates | S-106 |
| Book-Entry Certificates; Denominations | S-107 |
| Payments on Mortgage Loans; Accounts | S-108 |
| Investments of Amounts Held in Accounts | S-110 |
| Fees and Expenses | S-111 |
| Distributions | S-113 |
| Priority of Distributions Among Certificates | S-113 |
| Interest | S-114 |
| Principal | S-118 |
| Allocation of Losses | S-125 |
| Reports to Certificateholders | S-125 |
| Structuring Assumptions | S-126 |
| Optional Purchase of Defaulted Loans | S-134 |
| Optional Termination | S-134 |
| Events of Default; Remedies | S-135 |
| Certain Matters Regarding the Master Servicer, the Depositor and the Sellers | S-135 |
| The Trustee | S-135 |
| Voting Rights | S-137 |
| Restrictions on Transfer of the Class A-R Certificates | S-137 |

| Prospectus Supplement | Page |
|---|---|
| Ownership of the Residual Certificates | S-137 |
| Restrictions on Investment, Suitability Requirements | S-137 |
| Yield, Prepayment and Maturity Considerations | S-137 |
| General | S-137 |
| Prepayment Considerations and Risks | S-138 |
| Sensitivity of the Notional Amount Certificates | S-140 |
| Weighted Average Lives of the Offered Certificates | S-141 |
| Decrement Tables | S-141 |
| Last Scheduled Distribution Date | S-145 |
| The Subordinated Certificates | S-145 |
| Credit Enhancement | S-146 |
| Subordination | S-146 |
| Use of Proceeds | S-146 |
| Legal Proceedings | S-146 |
| Material Federal Income Tax Consequences | S-146 |
| Other Taxes | S-148 |
| ERISA Considerations | S-148 |
| Method of Distribution | S-150 |
| Legal Matters | S-150 |
| Ratings | S-151 |
| Index to Defined Terms | S-152 |

| Prospectus | Page |
|---|---|
| Important Notice About Information in This Prospectus and Each Accompanying Prospectus Supplement | 1 |
| Risk Factors | 2 |
| The Trust Fund | 12 |
| Use of Proceeds | 24 |
| The Depositor | 24 |
| Loan Program | 25 |
| Static Pool Data | 27 |
| Description of the Securities | 28 |
| Credit Enhancement | 43 |
| Yield, Maturity and Prepayment Considerations | 49 |
| The Agreements | 52 |
| Certain Legal Aspects of the Loans | 71 |
| Material Federal Income Tax Consequences | 79 |
| Other Tax Considerations | 100 |
| ERISA Considerations | 100 |
| Legal Investment | 103 |
| Method of Distribution | 104 |
| Legal Matters | 105 |
| Financial Information | 105 |
| Rating | 105 |
| Index to Defined Terms | 107 |

## Summary

This summary highlights selected information from this document and does not contain all of the information that you need to consider in making your investment decision. To understand all of the terms of an offering of the certificates, read carefully this entire document and the accompanying prospectus.

While this summary contains an overview of certain calculations, cash flow priorities and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities and other information in this prospectus supplement and the accompanying prospectus before making any investment decision.

### Issuing Entity

CHL Mortgage Pass-Through Trust 2006-HYB4, a common law trust formed under the laws of the State of New York.

*See "The Issuing Entity" in this prospectus supplement.*

### Depositor

CWMBS, Inc., a Delaware corporation, is a limited purpose finance subsidiary of Countrywide Financial Corporation.  Its address is 4500 Park Granada, Calabasas, California 91302, and its telephone number is (818) 225-3000.

*See "The Depositor" in the prospectus.*

### Sponsor and Sellers

Countrywide Home Loans, Inc. will be the sponsor of the transaction and a seller of a portion of the mortgage loans.  The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation or one of its subsidiaries, which acquired the mortgage loans they are selling directly from Countrywide Home Loans, Inc.

*See "Servicing of Mortgage Loans—Countrywide Home Loans" in this prospectus supplement.*

### Master Servicer

Countrywide Home Loans Servicing LP

*See "Servicing of Mortgage Loans—Countrywide Home Loans Servicing LP" in this prospectus supplement.*

### Trustee

The Bank of New York

*See "Description of the Certificates—The Trustee" in this prospectus supplement.*

### Pooling and Servicing Agreement

The pooling and servicing agreement among the sellers, the master servicer, the depositor and the trustee, under which the issuing entity will be formed.

### Cut-off Date

For any mortgage loan, the later of May 1, 2006 and the origination date for that mortgage loan (referred to as the *"cut-off date"*).

### Closing Date

On or about May 30, 2006.

### The Mortgage Loans

The mortgage pool will consist of conventional, hybrid adjustable rate mortgage loans secured by first liens on one- to four-family residential properties with an aggregate principal balance of approximately $452,870,239 as of the cut-off date.  All of the mortgage loans have original terms to maturity of 30 years.  The mortgage pool will be divided into four separate groups.  Each group of mortgage loans is referred to as a "loan group."  The mortgage rate on each mortgage loan is adjustable based on a specified index after a specified period after origination during which the mortgage rate is fixed.  The approximate aggregate stated principal balance of the mortgage loans in each loan group as of the cut-off date was as follows:

| Loan Group | Aggregate Principal Balance | Fixed Rate Period (months) |
|---|---|---|
| 1 | $126,305,332 | 36 |
| 2 | $78,500,807 | 60 |
| 3-A | $140,565,617 | 84 |
| 3-B | $107,498,484 | 84 |

The statistical information presented in this prospectus supplement is as of the cut-off date. The depositor believes that the information set forth in this prospectus supplement regarding the mortgage loans as of the cut-off date is representative of the characteristics of the mortgage loans that will be delivered on the closing date. However, certain mortgage loans may prepay or may be determined not to meet the eligibility requirements for inclusion in the final mortgage pool. A limited number of mortgage loans may be substituted for the mortgage loans that are described in this prospectus supplement. Any substitution will not result in a material difference in the final mortgage pool although the cut-off date information regarding the actual mortgage loans may vary somewhat from the information regarding the mortgage loans presented in this prospectus supplement.

As of the cut-off date, the mortgage loans in loan group 1 had the following characteristics:

| | |
|---|---|
| Aggregate Current Principal Balance | $126,305,332 |
| Geographic Concentrations in excess of 10%: | |
| California | 24.03% |
| Florida | 17.33% |
| Weighted Average Original Loan-to-Value Ratio | 76.80% |
| Weighted Average Current Mortgage Rate | 6.472% |
| Range of Current Mortgage Rates | 3.625% to 9.125% |
| Average Current Principal Balance | $298,594 |
| Range of Current Principal Balances | $25,343 to $1,800,000 |
| Weighted Average Remaining Term to Maturity | 357 months |
| Weighted Average FICO Score | 701 |
| Weighted Average Gross Margin | 2.347% |
| Weighted Average Maximum Mortgage Rate | 12.467% |
| Weighted Average Minimum Mortgage Rate | 2.352% |

As of the cut-off date, the mortgage loans in loan group 2 had the following characteristics:

| | |
|---|---|
| Aggregate Current Principal Balance | $78,500,807 |
| Geographic Concentrations in excess of 10%: | |
| California | 54.44% |
| Weighted Average Original Loan-to-Value Ratio | 75.01% |
| Weighted Average Current Mortgage Rate | 6.634% |
| Range of Current Mortgage Rates | 5.000% to 8.625% |
| Average Current Principal Balance | $353,607 |
| Range of Current Principal Balances | $49,708 to $2,000,000 |
| Weighted Average Remaining Term to Maturity | 358 months |
| Weighted Average FICO Score | 697 |
| Weighted Average Gross Margin | 2.608% |
| Weighted Average Maximum Mortgage Rate | 11.903% |
| Weighted Average Minimum Mortgage Rate | 2.635% |

As of the cut-off date, the mortgage loans in loan group 3-A had the following characteristics:

| | |
|---|---|
| Aggregate Current Principal Balance | $140,565,617 |
| Geographic Concentrations in excess of 10%: | |
| California | 43.50% |
| Weighted Average Original Loan-to-Value Ratio | 77.54% |
| Weighted Average Current Mortgage Rate | 6.593% |
| Range of Current Mortgage Rates | 4.875% to 8.625% |
| Average Current Principal Balance | $259,346 |
| Range of Current Principal Balances | $44,831 to $648,750 |
| Weighted Average Remaining Term to Maturity | 358 months |
| Weighted Average FICO Score | 683 |

| | |
|---|---|
| Weighted Average Gross Margin | 2.327% |
| Weighted Average Maximum Mortgage Rate | 11.684% |
| Weighted Average Minimum Mortgage Rate | 2.330% |

As of the cut-off date, the mortgage loans in loan group 3-B had the following characteristics:

| | |
|---|---|
| Aggregate Current Principal Balance | $107,498,484 |
| Geographic Concentrations in excess of 10%: | |
| California | 65.40% |
| Weighted Average Original Loan-to-Value Ratio | 75.23% |
| Weighted Average Current Mortgage Rate | 6.617% |
| Range of Current Mortgage Rates | 5.375% to 7.875% |
| Average Current Principal Balance | $614,277 |
| Range of Current Principal Balances | $419,580 to $2,000,000 |
| Weighted Average Remaining Term to Maturity | 357 months |
| Weighted Average FICO Score | 694 |
| Weighted Average Gross Margin | 2.301% |
| Weighted Average Maximum Mortgage Rate | 11.938% |
| Weighted Average Minimum Mortgage Rate | 2.301% |

See "The Mortgage Pool" in this prospectus supplement.

**Relationship Between the Loan Groups and the Certificate Groups**

The numeric prefix for each class of senior certificates designates the group of senior certificates to which that class belongs and corresponds to the loan group with the same number. For example, the certificates with a "1" prefix are sometimes referred

to in this prospectus supplement as the "group 1 senior certificates", the certificates with a "2" prefix are sometimes referred to in this prospectus supplement as the "group 2 senior certificates" and so forth. The Class A-R Certificates are part of the group 1 senior certificates. The subordinated certificates correspond to the mortgage loans in each loan group. The certificates generally receive distributions based on principal and interest collected from the mortgage loans in the corresponding loan group or loan groups.

See "Description of the Certificates—General" and "—Book-Entry Certificates; Denominations" in this prospectus supplement and "The Mortgage Pool" in this prospectus supplement and "The Trust Fund—The Mortgage Loans—General" in the prospectus.

*Description of the Certificates*

The issuing entity will issue seventeen classes of certificates, fourteen of which are offered by this prospectus supplement and the accompanying prospectus:

| Class | Initial Class Certificate Balance/Initial Notional Amount (1) | Type | Initial Rating (Moody's) (2) | Initial Rating (S&P) (2) |
|---|---|---|---|---|
| *Offered Certificates* | | | | |
| Class 1-A-1 | $ 105,092,000 | Super Senior/Variable Pass-Through Rate | Aaa | AAA |
| Class 1-A-2 | $ 11,677,000 | Senior Support/Variable Pass-Through Rate | Aaa | AAA |
| Class 1-A-IO | $ 116,769,000 (3)(4) | Senior/Interest-Only/Notional Amount/ Variable Pass-Through Rate/Component | Aaa | AAA |
| Class 2-A-1 | $ 65,317,000 | Super Senior/Variable Pass-Through Rate | Aaa | AAA |
| Class 2-A-2 | $ 7,257,000 | Senior Support/Variable Pass-Through Rate | Aaa | AAA |
| Class 2-A-IO | $ 72,574,000 (3)(5) | Senior/Interest-Only/Notional Amount/ Variable Pass-Through Rate/Component | Aaa | AAA |
| Class 3-A | $ 116,958,000 | Super Senior/Variable Pass-Through Rate | Aaa | AAA |
| Class 3-B | $ 89,444,000 | Super Senior/Variable Pass-Through Rate | Aaa | AAA |
| Class 3-AB | $ 22,933,000 (7) | Senior Support/Variable Pass-Through Rate/Component | Aaa | AAA |
| Class 3-A-IO | $ 229,335,000 (3)(6) | Senior/Interest-Only/Notional Amount/ Variable Pass-Through Rate/Component | Aaa | AAA |
| Class A-R | $ 100 | Senior/Variable Pass-Through Rate/Residual | Aaa | AAA |
| Class M | $ 12,001,000 | Subordinate/Variable-Pass Through Rate | Aa2 | AA |
| Class B-1 | $ 7,699,000 | Subordinate/Variable-Pass Through Rate | A2 | A |
| Class B-2 | $ 4,982,000 | Subordinate/Variable-Pass Through Rate | Baa2 | BBB |
| *Non-Offered Certificates*(8) | | | | |
| Class B-3 | $ 4,529,000 | Subordinate/Variable-Pass Through Rate | | |
| Class B-4 | $ 2,944,000 | Subordinate/Variable-Pass Through Rate | | |
| Class B-5 | $ 2,037,139 | Subordinate/Variable-Pass Through Rate | | |

(1) This amount is subject to a permitted variance in the aggregate of plus or minus 5% depending on the amount of mortgage loans actually delivered on the closing date.

(2) The offered certificates will not be offered unless they are assigned the indicated ratings by Moody's Investors Service, Inc. ("*Moody's*") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("*S&P*"). The Class B-3, Class B-4 and Class B-5 Certificates are not offered by this prospectus supplement, so ratings for those classes of certificates have not been provided. A rating is not a recommendation to buy, sell or hold securities. These ratings may be lowered or withdrawn at any time by either of the rating agencies. See "*Ratings*" in this prospectus supplement.

(3) The Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates are comprised of multiple components that are not separately transferable. The respective notional amounts of the Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates will be equal to the sum of the component notional amounts of their related components.

(4) The Class 1-A-IO Certificates will have two components, the Class 1-A-1 IO and Class 1-A-2 IO Components, with component notional amounts that are equal to the class certificate balance of the Class 1-A-1 and Class 1-A-2 Certificates, respectively.

(5) The Class 2-A-IO Certificates will have two components, the Class 2-A-1 IO and Class 2-A-2 IO Components, with component notional amounts that are equal to the class certificate balance of the Class 2-A-1 and Class 2-A-2 Certificates, respectively.

(6) The Class 3-A-IO Certificates will have four components, the Class 3-A IO, Class 3-B IO, Class 3-A2 IO and Class 3-B2 IO Components, with component notional amounts that are equal to the class certificate balances of the Class 3-A and Class 3-B Certificates and the component principal balances of the Class 3-A2 and Class 3-B2 Components, respectively.

(7) The Class 3-AB Certificates will have two components, the Class 3-A2 and Class 3-B2 Components, the initial component principal balances of which are $12,995,000 and $9,938,000, respectively.

(8) The Class B-3, Class B-4 and Class B-5 Certificates are not offered by this prospectus supplement. Any information contained in this prospectus supplement with respect to the Class B-3, Class B-4 and Class B-5 Certificates is provided only to permit a better understanding of the offered certificates.

The certificates also will have the following characteristics:

| Class | Related Loan Group | Pass-Through Rate | Interest Accrual Period | Interest Accrual Convention |
|---|---|---|---|---|
| *Offered Certificates* | | | | |
| Class 1-A-1 | 1 | (1) | calendar month (2) | 30/360 (3) |
| Class 1-A-2 | 1 | (1) | calendar month (2) | 30/360 (3) |
| Class 1-A-IO | 1 | (4) | calendar month (2) | 30/360 (3) |
| Class 2-A-1 | 2 | (5) | calendar month (2) | 30/360 (3) |
| Class 2-A-2 | 2 | (5) | calendar month (2) | 30/360 (3) |
| Class 2-A-IO | 2 | (6) | calendar month (2) | 30/360 (3) |
| Class 3-A | 3-A | (7) | calendar month (2) | 30/360 (3) |
| Class 3-B | 3-B | (8) | calendar month (2) | 30/360 (3) |
| Class 3-AB | 3-A and 3-B | (9) | calendar month (2) | 30/360 (3) |
| Class 3-A-IO | 3-A and 3-B | (10) | calendar month (2) | 30/360 (3) |
| Class A-R | 1 | (11) | calendar month (2) | 30/360 (3) |
| Class M | 1, 2, 3-A and 3-B | (12) | calendar month (2) | 30/360 (3) |
| Class B-1 | 1, 2, 3-A and 3-B | (12) | calendar month (2) | 30/360 (3) |
| Class B-2 | 1, 2, 3-A and 3-B | (12) | calendar month (2) | 30/360 (3) |
| *Non-Offered Certificates* | | | | |
| Class B-3 | 1, 2, 3-A and 3-B | (12) | calendar month (2) | 30/360 (3) |
| Class B-4 | 1, 2, 3-A and 3-B | (12) | calendar month (2) | 30/360 (3) |
| Class B-5 | 1, 2, 3-A and 3-B | (12) | calendar month (2) | 30/360 (3) |

(1) The pass-through rates for the Class 1-A-1 and Class 1-A-2 Certificates for the interest accrual period for any distribution date (i) on or prior to the distribution date in February 2009 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 1, minus 0.503629% and 0.403629%, respectively and (ii) after the distribution date in February 2009 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 1.

(2) The interest accrual period for any distribution date will be the calendar month before the month of that distribution date.

(3) Interest will accrue at the rate described in this table on the basis of a 360 day year divided into twelve 30 day months.

(4) The pass-through rate for the Class 1-A-IO Certificates for the interest accrual period for any distribution date (i) on or prior to the distribution date in February 2009 will be a per annum rate equal to the weighted average component rates of the Class 1-A-1 IO and Class 1-A-2 IO Components and (ii) after the distribution date in February 2009 will be a per annum rate equal to 0%. The component rates for the Class 1-A-1 IO and Class 1-A-2 IO Components for the interest accrual period for any distribution date (i) on or prior to the distribution date in February 2009 will be a per annum rate equal to 0.503629% and 0.403629%, respectively and (ii) after the distribution date in February 2009 will be a per annum rate equal to 0% in each case.

(5) The pass-through rates for the Class 2-A-1 and Class 2-A-2 Certificates for the interest accrual period for any distribution date (i) on or prior to the distribution date in March 2011 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 2, minus 0.513039% and 0.413039%, respectively and (ii) after the distribution date in March 2011 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 2.

(6) The pass-through rate for the Class 2-A-IO Certificates for the interest accrual period for any distribution date (i) on or prior to the distribution date in March 2011 will be a per annum rate equal to the weighted average component rates of the Class 2-A-1 IO and Class 2-A-2 IO Components and (ii) after the distribution date in March 2011 will be a per annum rate equal to 0%. The component rates for the Class 2-A-1 IO and Class 2-A-2 IO Components for the interest accrual period for any distribution date (i) on or prior to the distribution date in March 2011 will be a per annum rate equal to 0.513039% and 0.413039%, respectively and (ii) after the distribution date in March 2011 will be a per annum rate equal to 0% in each case.

(7) The pass-through rate for the Class 3-A Certificates for the interest accrual period for any distribution date (i) on or prior to the distribution date in March 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-A, minus 0.318886% and (ii) after the distribution date in March 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-A.

(8) The pass-through rate for the Class 3-B Certificates for the interest accrual period for any distribution date (i) on or prior to the distribution date in February 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-B, minus 0.357092% and (ii) after the distribution date in February 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-B.

(9) The pass-through rate for the Class 3-AB Certificates for the interest accrual period for any distribution date, will be a per annum rate equal to the weighted average component rates of the Class 3-A2 and Class 3-B2 Components. The component rate for the Class 3-A2 Component for the interest accrual period for any distribution date (i) on or prior to the distribution date in March 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-A, minus 0.230732% and (ii) after the distribution date in March 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-A. The component rate for the Class 3-B2 Component for the interest accrual period for any distribution date (i) on or prior to the distribution date in February 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-B, minus 0.268938% and (ii) after the distribution date in February 2013 will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 3-B.

(10) The pass-through rate for the Class 3-A-IO Certificates for the interest accrual period for any distribution date (i) on or prior to the distribution date in March 2013 will be a per annum rate equal to the weighted average component rates of the Class 3-A IO, Class 3-B IO, Class 3-A2 IO and Class 3-B2 IO Components and (ii) after the distribution date in March 2013 will be a per annum rate equal to 0%. The component rates for the Class 3-A IO and Class 3-A2 IO Components for the interest accrual period for any distribution date (i) on or prior to the distribution date in March 2013 will be a per annum rate equal to 0.318886% and 0.230732%, respectively and (ii) after the distribution date in March 2013 will be a per annum rate equal to 0% in each case. The component rates for the Class 3-B IO and Class 3-B2 IO Components for the interest accrual period for any distribution date (i) on or prior to the distribution date in February 2013 will be a per annum rate equal to 0.357092% and 0.268938%, respectively and (ii) after the distribution date in February 2013 will be a per annum rate equal to 0% in each case.

(11) The pass-through rate for the Class A-R Certificates for the interest accrual period related to any distribution date will be a per annum rate equal to the weighted average adjusted net mortgage rate of the mortgage loans in loan group 1.

(12) For the interest accrual period for any distribution date, the pass-through rate for each class of subordinated certificates will be equal to (i) the sum of the following for each loan group: the product of (1) the weighted average of the adjusted net mortgage rates of the mortgage loans in that loan group as of the first day of the prior calendar month and (2) the aggregate stated principal balance of the mortgage loans in that loan group as of the first day of the prior calendar month, minus the aggregate class certificate balance of the senior certificates (other than the Notional Amount Certificates) related to that loan group immediately prior to that distribution date, *divided by* (ii) the aggregate class certificate balance of the subordinated certificates immediately prior to that distribution date.

*See "Description of the Certificates"* in this prospectus supplement.

## Designations

We sometimes use the following designations to refer to the specified classes of certificates in order to aid your understanding of the offered certificates.

| Designation | Classes of Certificates |
|---|---|
| Senior Certificates | Class 1-A-1, Class 1-A-2, Class 1-A-IO, Class 2-A-1, Class 2-A-2, Class 2-A-IO, Class 3-A, Class 3-B, Class 3-AB, Class 3-A-IO and Class A-R Certificates |
| Subordinated Certificates | Class M and Class B Certificates |
| Notional Amount Certificates | Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates |
| Class B Certificates | Class B-1, Class B-2, Class B-3, Class B-4 and Class B-5 Certificates |
| Offered Certificates | Senior Certificates, Class M, Class B-1 and Class B-2 Certificates |

## Record Date

The record date for each class of certificates and any distribution date will be the last business day of the month preceding the month of that distribution date.

## Denominations

*Offered Certificates other than the Class A-R Certificates:*

$25,000 and multiples of $1 in excess thereof.

*Class A-R Certificates:*

Two certificates of $99.99 and $0.01, respectively.

## Registration of Certificates

*Offered Certificates other than the Class A-R Certificates:*

Book-entry form. Persons acquiring beneficial ownership interests in the offered certificates (other than the Class A-R Certificates) may elect to hold their beneficial interests through The Depository Trust Company.

*Class A-R Certificates:*

Fully registered certificated form. The Class A-R Certificates will be subject to certain restrictions on

transfer described in this prospectus supplement and as more fully provided for in the pooling and servicing agreement.

See *"Description of the Certificates—Book-Entry Certificates; Denominations" and "—Restrictions on Transfer of the Class A-R Certificates"* in this prospectus supplement.

## Distribution Dates

We will make distributions on the business day immediately following the master servicer remittance date. The first distribution is scheduled for June 20, 2006.

## Master Servicer Remittance Dates

The 19th day of each month, or if such day is not a business day, the next succeeding business day, beginning in June 2006.

## Last Scheduled Distribution Date

The last scheduled distribution date for the certificates is the distribution date in June 2036. Since the rate of distributions in reduction of the class certificate balance or notional amount of each class of offered certificates will depend on the rate of payment (including prepayments) of the mortgage loans, the class certificate balance or notional amount of any class could be reduced to zero significantly earlier or later than the last scheduled distribution date. See *"Yield, Prepayment and Maturity Considerations—Last Scheduled Distribution Date"* in this prospectus supplement.

## Interest Payments

The interest accrual period, interest accrual convention and pass-through rate for each class of interest-bearing certificates is shown in the table on page S-8.

The Class 1-A-IO, Class 2-A-IO and Class 3-A-IO Certificates will only be entitled to receive distributions of interest up to and including the distribution date in February 2009, March 2011 and March 2013, respectively.

On each distribution date, to the extent funds are available, each class of certificates will be entitled to receive:

- interest accrued at the applicable pass-through rate during the related interest accrual period on