1   SUNNY S. HUO (State Bar No. 181071)
    ssh@severson.com
2   KALAMA M. LUI-KWAN (State Bar No. 242121)
    kml@severson.com
3   SEVERSON & WERSON
    A Professional Corporation
4   One Embarcadero Center, Suite 2600
    San Francisco, CA 94111
5   Telephone: (415) 398-3344
    Facsimile: (415) 956-0439
6
    Attorneys for Defendants
7   Countrywide Home Loans, Inc. (d/b/a
    America's Wholesale Lender), BAC Home
8   Loans Servicing, LP (f/k/a Countrywide
    Home Loans Servicing L.P.), ReconTrust
9   Co., N.A., Bank of America, N.A., and
    Bank of New York Mellon f/k/a The
10  Bank of New York as Trustee

11

12                    UNITED STATES DISTRICT COURT

13                   NORTHERN DISTRICT OF CALIFORNIA

14  PETRA MARTINEZ,                      Case No.: 09-cv-05630-WHA

15              Plaintiff,               **NOTICE OF MOTION, MOTION FOR
                                         SUMMARY JUDGMENT, AND
16       v.                              MEMORANDUM OF POINTS AND
                                         AUTHORITIES**
17  AMERICA'S WHOLESALE LENDER, et al.,
                                         Date:      March 4, 2010
18              Defendants.              Time:      8:00 a.m.
                                         Courtroom: 9, 19th Floor
19                                       Judge:     Hon. William H. Alsup

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES ................................................................................................iv

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT .....................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................................1

I.  INTRODUCTION.................................................................................................1

II.  HISTORY OF THE LOAN ...................................................................................3

    A.  Plaintiff Applies For A Mortgage Loan Refinancing ................................3

    B.  Plaintiff Falls Behind On Her Payments And Defaults On The Loan......................6

    C.  Plaintiff Submits Short Sale And Modification Proposals To Countrywide ..............6

III.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE
    THEY COMPLIED WITH THE DEED OF TRUST AND CALIFORNIA LAW
    IN COMMENCING THE FORECLOSURE PROCESS.................................................8

    A.  Defendants Properly Commenced The Foreclosure Process ...............................9

        1.  Defendants Gave Plaintiff Notice Of Her Default ......................................9

        2.  ReconTrust Properly Recorded A Notice Of Default And Notice Of
            Trustee's Sale ................................................................................10

            a.  ReconTrust Properly Recorded The Notice Of Default In Its
                Capacity As Agent For The Beneficiary...........................................10

            b.  ReconTrust Properly Recorded The Notice of Trustee's Sale
                In Its Capacity As Trustee.............................................................11

            c.  The Deed Of Trust Allows MERS, As The Beneficiary, To
                Substitute The Trustee On The Loan .............................................13

            d.  The Notice of Default Contained The Correct Dates And
                Was The Same Notice Served Upon Plaintiff .................................14

            e.  Defendants Complied With Civil Code Section 2923.5 ...................15

            f.  Ms. Elizavet Meza Properly Executed The Substitution Of
                Trustee On Behalf Of MERS .......................................................16

    B.  Defendants Are Not Required To Possess Or Produce The Original
        Promissory Note Before Commencing Foreclosure Because The
        UCC Does Not Apply To Nonjudicial Foreclosures In California.........................17

        1.  California Courts Do Not Recognize The "Produce The Note" Theory .......17

        2.  The UCC Does Not Apply To Nonjudicial Foreclosures............................18

        3.  The Bank Of New York Mellon Possesses The Original Note ...................19

    C.  Plaintiff's Miscellaneous Challenges To The Foreclosure Process Are Wrong .......20

IV.  PLAINTIFF CANNOT STATE A CLAIM AS A MATTER OF LAW.............................22

V.  CONCLUSION .................................................................................................23

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 8, 9, 10

*Apple, Inc. v. Psystar Corp.*, --- F.Supp.2d ----, 2009 WL 3809798
(N.D. Cal. Nov. 13, 2009) .................................................................................................... 8

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ................................................................................ 22

*Candelo v. NDex West, LLC*, 2008 WL 5382259 (E.D. Cal. Dec. 23, 2008) ............................ 17

*Castaneda v. Saxon Mortg. Services, Inc.*, --- F.Supp.2d ----, 2009 WL 4640673
(E.D. Cal. Dec. 3, 2009) ...................................................................................................... 19

*Karlsen v. American Sav. & Loan Ass'n*, 92 Cal.Rptr. 851 (1971) ............................................ 22

*Farahani v. Cal-Western Reconveyance Corp.*, 2009 WL 1309732
(N.D. Cal. May 8, 2009) ................................................................................................ 18, 19

*Flower v. Wachovia Mortgage FSB*, 2009 WL 975811 (N.D. Cal. Apr. 10, 2009) ................. 7, 8

*Gaitan v. Mortgage Electronic Registration Sys.*, 2009 WL 3244729
(C.D. Cal. Oct. 5, 2009) ...................................................................................................... 19

*Giles v. General Motors Acceptance Corp.*, 494 F.3d 865 (9th Cir. 2007) ................................ 8

*I.E. Assocs. v. Safeco Title Ins. Co.*, 39 Cal.3d 281 (1985) ..................................................... 18

*Knapp v. Doherty*, 123 Cal.App.4th 76 (2004) ....................................................................... 22

*Moeller v. Lien*, 25 Cal.App.4th 822 (1994) ............................................................... 11, 18, 19

*Moore v. Chase Bank*, 2008 WL 961161 (N.D. Cal. Apr. 7, 2008) .......................................... 22

*Neal v. Juarez*, 2007 WL 2140640 (S.D. Cal. July 23, 2007) .................................................. 18

*Nguyen v. Calhoun*, 105 Cal.App.4th 428 (2003) ................................................................... 13

*Pantoja v. Countrywide Home Loans, Inc.*, 640 F.Supp.2d 1177 (N.D. Cal. 2009) ................... 22

*Putkkuri v. ReconTrust Co.*, 2009 WL 32567 (S.D. Cal. Jan. 5, 2009) ................................... 17

*Reynoso v. Paul Financial, LLC*, 2009 WL 3833298 (N.D. Cal. Nov. 16, 2009) ................ 13, 19

*Runaj v. Wells Fargo Bank*, --- F.Supp.2d ----, 2009 WL 3234182
(S.D. Cal. Sept. 30, 2009) .................................................................................................... 21

*San Diego Home Solutions, Inc. v. ReconTrust Co.*, 2008 WL 5209972
(S.D. Cal. Dec. 10, 2008) .................................................................................................... 18

*Smith v. Wachovia*, 2009 WL 1948829 (N.D. Cal. July 6, 2009) ............................................. 19

*Tina v. Countrywide*, 2008 WL 4790906 (S.D. Cal. Oct. 30, 2008) ........................................ 18

# RULES AND STATUTES

California Civil Code
        Section 2923.5 ................................................................................................ 15, 16
        Section 2924 ............................................................................................. 11, 18, 19
        Section 2924b ...................................................................................................... 13
        Section 2924f ...................................................................................................... 12
        Section 2934a ............................................................................................... 11, 13

Uniform Commercial Code
        Section 3301 ........................................................................................................ 19
        Section 3309 ........................................................................................................ 19

Federal Rules of Civil Procedure
        Rule 56 ............................................................................................................. 1, 8

# STATEMENT OF ISSUES

## (Civil Local Rule 7-4(a)(3))

1.  Did defendants Countrywide Home Loans, Inc. (d/b/a America's Wholesale Lender), BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing L.P.), ReconTrust Company, N.A., Bank of America, N.A., and Bank of New York Mellon f/k/a The Bank of New York as Trustee ("Defendants") comply with their contractual and statutory obligations under the deed of trust and California Civil Code in commencing the foreclosure process?

2.  Do Defendants need to possess the original promissory note before commencing foreclosure where California law does not recognize any such rule, and where Defendants in any event possess the original note?

3.  Does plaintiff Petra Martinez ("Plaintiff") lack standing to pursue any of her claims as a matter of law based on her failure to comply with California's "tender rule"?

4.  Can Plaintiff state a claim based on alleged failures to comply with procedural requirements in commencing the foreclosure process where she has not demonstrated that she suffered any prejudice as a result of the purported irregularities?

5.  Has Plaintiff alleged facts sufficient to state a claim under Rules 8 and 9(b) of the Federal Rules of Civil Procedure?

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

Please take notice that on March 4, 2010, at 8:00 a.m., or as soon thereafter as counsel may be heard in Courtroom 9, 19th Floor, of the above-entitled court at 450 Golden Gate Avenue, San Francisco, California, before the Honorable William H. Alsup, defendants Countrywide Home Loans, Inc. (d/b/a America's Wholesale Lender), BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing L.P.), ReconTrust Company, N.A., Bank of America, N.A., and Bank of New York Mellon f/k/a The Bank of New York as Trustee ("Defendants") will, and hereby do, move for summary judgment.

This motion is brought under Fed. R. Civ. P. 56(b) on the ground that Defendants are entitled to judgment as a matter of law because there is no genuine issue of material fact, as explained further in the accompanying memorandum of points and authorities. This motion is based on this notice of motion and motion, the attached supporting memorandum, and the accompanying declarations of Michael Cerchio, Kalama M. Lui-Kwan, George Merziotis, and Eva Tapia, as well as on the complaint and other records on file in this action, and any further briefs, evidence, authorities, or argument presented before or at the hearing of this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

This is not a case about a first-time homeowner who was duped by a lender. The plaintiff in this case, Petra Martinez ("Plaintiff"), is a sophisticated real-estate investor who currently owns two properties in Salinas—a rental property that generates thousands of dollars each month in income, and a second home that was worth millions of dollars when she purchased it.

This is not a case about a naïve borrower who was misled about the terms of her loan. The loan at issue in this case is a $1.5 million refinancing of loans that Plaintiff had obtained to purchase her second home. When Plaintiff applied for the $1.5 million refinancing, she explained on her application that she intended to use the proceeds to pay off the $1.05 million that she owed on the preexisting loans and to strip more than $400,000 *in cash* from the property.

This is not a case about an innocent consumer who suddenly became unable to pay her adjustable-rate loan when the interest rate increased. Under the terms of the loan, which Plaintiff

obtained in January 2006, her rate was fixed at 6.500% until February 2013.  She nevertheless defaulted on May 1, 2008, *i.e.*, more than four years before her rate was set to change in 2013.

This is a case about a plaintiff who bought a second home that was beyond her means.

Plaintiff stopped paying her $1.5 million loan in May 2008 because, as she admits, she could no longer afford the monthly payments.  Nearly nine months later, on January 28, 2009, the loan beneficiary's agent recorded a notice of default.  More than three months after that, on May 4, the loan trustee recorded a notice of trustee's sale, which scheduled the sale for May 20.  Throughout that period, the parties discussed a potential loan modification or short sale, which resulted in multiple postponements of the trustee's sale, but were unable to reach an agreement.

Then, on August 3, 2009, Plaintiff filed this action in the Superior Court for the State of California, Monterey County ("Superior Court").  Among other things, Plaintiff contends that the very entities from which Plaintiff obtained the $1.5 million loan, and from which she later sought a modification, had no legal right to foreclose upon the property.

Defendants Countrywide Home Loans, Inc. (d/b/a America's Wholesale Lender), BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing L.P.) ("Countrywide"), ReconTrust Co., N.A. ("ReconTrust"), Bank of America, N.A., and Bank of New York Mellon f/k/a The Bank of New York as Trustee ("Defendants") removed the action to this Court and filed a motion to dismiss, which was heard on January 14, 2009.  At the hearing, the Court declined to rule on the merits of the motion, and instead instructed Defendants to file a motion for summary judgment to: (1) lay out with documents why the foreclosure procedure was done right; and (2) show either that Defendants possess the original promissory note, or that possession is not required to commence foreclosure.

As set forth below, there is no genuine issue of fact as to Defendants' compliance with their contractual and statutory obligations in executing the foreclosure process; nor is there any genuine issue as to Defendants' right to proceed with foreclosure regardless of whether they possess the original promissory note—though they do indeed possess the original note.  Defendants therefore respectfully request that the Court grant this motion for summary judgment in its entirety, and enter judgment in Defendants' favor.

## II.    HISTORY OF THE LOAN

### A.    Plaintiff Applies For A Mortgage Loan Refinancing

Plaintiff applied for a $1,500,000.00 loan from defendant America's Wholesale Lender ("AWL") by executing a loan application ("Application") on January 13, 2006 ("Loan").  (Ex. 1.)[1]  The Application shows that Plaintiff is a savvy real-estate investor who understands the market well enough to know how to: (1) obtain more than $400,000.00 in cash by refinancing her loan; and (2) maintain a second property for rental income.

The Application shows that Plaintiff intended to use the Loan to strip hundreds of thousands of dollars in equity from her property.  According to the Application, Plaintiff planned to use $1,054,414.00 of the Loan proceeds to refinance preexisting loans that she owed to Union Bank and Chase Mortgage.  (Merziotis Decl., Ex. A.)  She also planned to use $24,139.00 of the proceeds to pay for closing costs and other items.  (*Id.*)  The Application identifies these amounts as follows:

| | | |
|---|---|---|
| a. Purchase price | $ | |
| b. Alterations, improvements, repairs | | |
| c. Land (if acquired separately) | | |
| d. Refinance (incl. debts to be paid off) | 1,054,414.00 | |
| e. Estimated prepaid items | 4,062.50 | |
| f. Estimated closing costs | 20,076.50 | |
| g. PMI, MIP, Funding Fee | | |
| h. Discount (if Borrower will pay) | | |
| i. Total costs (add items a through h) | 1,078,553.00 | |
| j. Subordinate financing | | |
| k. Borrower's closing costs paid by Seller | | |
| l. Other Credits (explain) | | |

| | |
|---|---|
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 1,500,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 1,500,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | -421,447.00 |

(*Id.*)  Thus, after refinancing her preexisting obligations and paying for closing costs and other fees, Plaintiff was able to strip $421,447.00 in cash from her property by obtaining the new Loan.

The Application also shows that Plaintiff owned multiple properties.  The AWL Loan and the refinanced loans were all secured by property located at 25339 Camino De Chamisal in Salinas ("Property").  The Property, however, was not the only piece of real estate that Plaintiff owned when she signed the Application.  She owned another property in Salinas located at 1414 Grandhaven Street, which she rented to tenants for $2,200.00 per month ("Rental Property"):

---

[1] The Application and other related documents contain a printed date of January 4 or January 5, 2006. (*See, e.g.*, Decl. of G. Merziotis ("Merziotis Decl."), Exs. A-F.)  Although these documents appear to have been printed on those dates, Plaintiff signed them as of January 13, 2006.  (*See id.*)

| PRO FORMA ASSETS AND LIABILITIES (Cont) | | | | | | | | |
| Schedule of Real Estate Owned (if additional properties are owned, use continuation sheet) | | | | | | | | |
| Property Address (enter S if sold, PS if pending sale) or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
| 1414 Grandhaven Street Salinas, CA 93906 | R | SFR | $ 250,000 | $ | n/a | $ 2,200 | $ 0 | $ 175 | $ 1,475 |
| 25529 CAMINO DE CHAMISAL SALINAS, CA 93908 | | SFR | 2,000,000 | 1,654,414 | | 6,922 | 187 | |
| Totals | | | $ 2,250,000 | $ 1,654,414 | $ 2,200 | $ 6,922 | $ 362 | $ 1,475 |

(*Id.*) The Application indicates that Plaintiff had already fully paid the mortgage on the Rental Property. Thus, the only regular expense that Plaintiff incurred in connection with the Rental Property was $175.00 in insurance, maintenance, taxes, and other costs. (*Id.*)

When Plaintiff signed the Application, she acknowledged receiving the required disclosures. For instance, she acknowledged receiving the federal Truth in Lending disclosure:



(*Id.*, Ex. B.)

Plaintiff also acknowledged receiving the Notice of Right to Cancel:



(*Id.*, Ex. C.)

She also acknowledged receiving the Application Disclosure Handbook; Affiliated Business Arrangement Disclosure Statement; Servicing Transfer Disclosure; Hazard Insurance Requirements; Title Company and Closing Agent Notice; IRS Disclosure Notice; Consumer Handbook on Adjustable Rate Mortgages; and HUD Booklet:



(*Id.*, Ex. D.)

Plaintiff also acknowledged receiving a completed copy of a disclosure itemizing the exact fees that were to be paid in connection with the Loan transaction ("Reg. Z Disclosure"):

I/We hereby acknowledge reading and receiving a completed copy of this disclosure.

_Petra Martinez_          1/13/06          _Stan Atkinson_          1/13/06
Borrower                  Date              Borrower                 Date
PETRA MARTINES                              STANLEY ATKINSON

(*Id.*, Ex. E.)  The Reg. Z Disclosure specifically details the dollar amounts to be paid for, among other things: underwriting; booker origination; courier/express mail; loan tie-in; sub-escrow; closing; flood check; processing; and the settlement agent.  (*Id.*)

That same day, January 13, 2006, Plaintiff signed an "Adjustable Rate Note" ("Note") and a deed of trust with an adjustable-rate rider ("Deed of Trust").  (*Id.*, Ex. F; Decl. of K. Lui-Kwan ("Lui-Kwan Decl."), Ex. 1.)  Under the Note, Plaintiff agreed to pay the $1.5 million Loan at a rate of 6.500%, or $8,125.00 per month.  The rate was fixed until February 1, 2013, at which time it was subject to adjustment.  The Deed of Trust, which was recorded on January 20, 2006 with the Monterey County Recorder's Office ("Recorder's Office"), states that the Loan is secured by the Property.  (Lui-Kwan Decl., Ex. 1.)  The Deed of Trust also sets forth the parties' rights and obligations in the event of Plaintiff's default.  (*Id.*; *see infra* § III(A).)

On January 17, 2006, as the settlement agent, Fidelity National Title ("Fidelity") executed a set of closing instructions.  (Merziotis Decl., Ex. G.)  The instructions identified the fees that were to be paid to Fidelity as the settlement agent ($3,800.00), Placer Financial as Plaintiff's broker ($15,966.50), and AWL as lender for tax service, flood check, and underwriting fees ($836.00).  By signing the instructions, Fidelity also "certif[ied] that the Loan has been Closed and Disbursed . . . ."  (*Id.*)

Two months later, in March 2006, Plaintiff signed another deed of trust, which purports to secure a home equity line of credit ("HELOC Deed of Trust").  (Lui-Kwan Decl., Ex. 2.) According to the HELOC Deed of Trust, Plaintiff obtained a $300,000 home equity line of credit secured by the Property.  Around that same time, Plaintiff's then-husband, Stanley Atkinson, executed an Interspousal Transfer Deed, which transferred his interest in the Property to Plaintiff. (*Id.*, Ex. 3.)

Thus, between January and March 2006, Plaintiff had stripped more than $400,000 in cash from the Property by refinancing her mortgage with the $1.5 million AWL Loan, obtained sole title to the Property, and obtained another $300,000 from a HELOC secured by the Property.

### B.   Plaintiff Falls Behind On Her Payments And Defaults On The Loan

Just one year after signing the Loan documents, Plaintiff started to fall behind on her payments. Countrywide sent Plaintiff a letter dated February 16, 2007, informing her that the "loan has an unpaid late charge of $409.00." (Merziotis Decl., Ex. I.) Ten months later, on November 30, 2007, Countrywide sent Plaintiff another letter, explaining that it "recently reviewed [her] Tax Authority's official records and discovered that there are delinquent property taxes owed on the above-referenced property." (*Id.*, Ex. J.)

In May 2008, shortly after Countrywide sent Plaintiff the February and November 2007 notices, Plaintiff defaulted on her Loan. In a June 16, 2008 letter to Plaintiff, Countrywide explained to her that the "loan is in serious default because the required payments have not been made." (Merziotis Decl., Ex. K.) It explained that Plaintiff had a right to cure the default, and that "t[o] cure the default, on or before July 16, 2008, Countrywide must receive the amount of $17,875.00 plus any additional regular monthly payment or payments, late charges, fees and charges, which become due on or before July 16, 2008." (*Id.*)

### C.   Plaintiff Submits Short Sale And Modification Proposals To Countrywide

Three months later, Countrywide sent a letter dated September 16, 2008 to Plaintiff "pursuant to California Code section 2923.5" informing her that "[w]e would like to talk to you about your current loan situation to determine if you qualify for one of Countrywide's workout options," including loan modification, repayment arrangements, deed in lieu, short-sale payoff, and full reinstatement. (*Id.*, Ex. L.)

On February 26, 2009, less than a month after a Notice of Default was recorded (*see infra* § II(A)(2)(a)), Countrywide received a 21-page fax from Ron Doster at Placer Financial Services, the broker that represented Plaintiff in the January 2006 Loan. (Merziotis Decl., Ex. N.) The fax contained: (1) four letters from Mr. Doster stating that Plaintiff and her ex-husband, Stanley Atkinson, were interested in pursuing a short sale to Mr. Atkinson; (2) a proposed short-sale agreement between Plaintiff and Mr. Atkinson; (3) signature authorization forms executed by Plaintiff and Mr. Atkinson; and (4) two letters from Plaintiff about the proposed short sale. (*Id.*)

One of the two letters from Plaintiff regarding the proposed short sale establishes that Plaintiff stopped paying the Loan to Countrywide because she could no longer afford it, *i.e.*, not because Countrywide lacked "any interest" in the Loan. (FAC ¶ 62.) In the letter, she states that the value of her home has dropped from $2 million to just over $1 million, her income has decreased, and she is interested in pursuing a short sale to her ex-husband:



(Merziotis Decl., Ex. N at p. 21.)

For at least six months, between March and September 2009, Plaintiff, Mr. Atkinson, and Countrywide discussed the possibility of a short sale and loan modification. (*Id.*, Exs. I, P-Q.) On September 22, however, Countrywide advised Mr. Atkinson that the short sale was declined because he was Plaintiff's ex-husband and a party to the January 2006 deed of trust. (*Id.*, Ex. Q.)[2]

Countrywide's decision to decline the short-sale proposal should not have surprised Plaintiff. Like many other banks, Countrywide does not typically approve such sales because "family members of a defaulting borrower are more likely to engage in 'straw man' transactions designed to pass the costs of default to the lender while retaining the property." *Flower v. Wachovia Mortgage FSB*, 2009 WL 975811, at *5 (N.D. Cal. Apr. 10, 2009). In such transactions, the relative would purchase the home and give it back to the plaintiff-borrower for an amount less than the loan balance, which is essentially a fraud on the lender. The "practical

---

[2] Defendants engaged in conversations and written correspondence with Plaintiff, her ex-husband, and Plaintiff's broker for a considerable amount of time. They also tried to accommodate Plaintiff throughout the parties' oral and written discussions by postponing the trustee's sale on multiple occasions. To date, the trustee's sale has been postponed 12 times between May 20, 2009 and the present. (Decl. of E. Tapia ("Tapia Decl.") ¶ 13; *id.*, Ex. G.) The sale is currently scheduled for March 5, 2010. (*Id.*, Ex. G.)

1  result" of this fraud "would have been a reduction of the principal balance on [the] loan in the

2  amount of the difference between the loan value and the proposed sale price[,]" *i.e.*, a difference

3  of hundreds of thousands of dollars that the investor would be forced to absorb. *Id.*

4      On August 3, 2009, while the parties were still discussing a possible short sale of the

5  Property, Plaintiff filed this action in Superior Court, purporting to challenge Defendants' right to

6  foreclose on the Property.

7  **III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY
           COMPLIED WITH THE DEED OF TRUST AND CALIFORNIA LAW IN**
8  **          COMMENCING THE FORECLOSURE PROCESS**

9      Summary judgment "must be granted under FRCP 56 when 'the pleadings, the discovery

10 and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

11 material fact and that the movant is entitled to judgment as a matter of law.'"  *Apple, Inc. v.*

12 *Psystar Corp.*, --- F.Supp.2d. ----, 2009 WL 3809798, at *2 (N.D. Cal. Nov. 13, 2009) (Alsup, J.)

13 (quoting Fed. R. Civ. P. 56(c)).  A district court must determine, viewing the evidence in the light

14 most favorable to the nonmoving party, whether there is any genuine issue of material fact. *Giles*

15 *v. General Motors Acceptance Corp.*, 494 F.3d 865, 872 (9th Cir. 2007).  A genuine issue of fact

16 is one that could reasonably be resolved, based on the factual record, in favor of either party. A

17 dispute is "material" only if it could affect the outcome of the suit under the governing law.

18 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

19      In this case, summary judgment is appropriate for two reasons.  First, there is no genuine

20 issue of material fact as to Defendants' compliance with their obligations in executing the

21 foreclosure process.  They fully complied with the requirements set forth in the Deed of Trust and

22 the Civil Code.  Second, there is no genuine issue as to whether Defendants have a legal right to

23 proceed with the trustee's sale.  As a matter of law, contrary to Plaintiff's unsupported argument,

24 Defendants do not need to physically possess the original promissory note.  And even if such a

25 requirement existed, judgment would still be proper because testimony from defendant Bank of

26 New York Mellon f/k/a The Bank of New York as Trustee ("BNY") shows that it does, in fact,

27 possess the original note.  Because Plaintiff cannot credibly refute Defendants' showing as to

28 either of these two matters, summary judgment should be entered against her as a matter of law.

**A.      Defendants Properly Commenced The Foreclosure Process**

The Deed of Trust and Civil Code Sections 2924, *et seq.*, lay out the procedure for

commencing foreclosure.  Defendants complied with these requirements as set forth below.

**1.      Defendants Gave Plaintiff Notice Of Her Default**

Under the Deed of Trust that Plaintiff signed, the lender is required to "give notice to

Borrower prior to acceleration following Borrower's breach of any covenant or agreement" in the

deed.  (Lui-Kwan Decl., Ex. 1 ¶ 22.)  The notice must contain specific information about: (1) "the

default"; (2) "the action required to cure the default"; (3) "a date, not less than 30 days from the

date the notice is given to Borrower, by which the default must be cured"; and (4) "that failure to

cure the default on or before the date specified in the notice may result in acceleration of the sums

secured by [the] Security Instrument and sale of the Property."  (*Id.*)

Countrywide complied with each of these four requirements by sending a November 21,

2008 "Notice of Intent to Accelerate" to Plaintiff by certified mail ("Notice of Intent").  The

Notice of Intent identified the amount required to reinstate the Loan as follows:

| | | |
|---|---|---|
| Countrywide Home Loans Servicing LP (hereinafter "Countrywide") services the home loan described above on behalf of the holder of the promissory note (the "Noteholder").  The loan is in serious default because the required payments have not been made.  The total amount now required to reinstate the loan as of the date of this letter is as follows: | | |
| Monthly Charges: | 05/01/2008 | $56,875.00 |
| Late Charges: | 05/01/2008 | $2,843.75 |
| Other Charges: | Total Late Charges:<br>Uncollected Costs:<br>Partial Payment Balance: | $1,218.75<br>$75.00<br>($0.00) |
| | **TOTAL DUE:** | **$61,012.50** |

(Merziotis Decl., Ex. M.)

The Notice of Intent informed Plaintiff that: (1) she is "in serious default because the

required payments have not been made"; (2) "[t]o cure the default, on or before December 21,

2008, Countrywide must receive the amount of $61,012.50 plus any additional regular payment

or payments, late charges, fees, and charges, which become due on or before December 21,

2008"; (3) "[t]he default will <u>not</u> be considered cured unless Countrywide receives 'good funds'

in the amount of $61,012.50 on or before December 21, 2008"; and (4) "[i]f the default is not

cured on or before December 21, 2008, the mortgage payments will be accelerated with the full

amount remaining accelerated and becoming due and payable in full, and foreclosure proceedings

1   will be initiated at that time." (*Id.*, Ex. M.) By sending the Notice of Intent, Countrywide

2   complied with the four requirements set forth in Paragraph 22 of the Deed of Trust. (Lui-Kwan

3   Decl., Ex. 1; Merziotis Decl., Exs. K, M.)[3]

4          Plaintiff does not (and cannot) allege that she submitted the $61,012.50 amount by

5   December 21, 2008. Nor does she allege that she paid any other amount before or after that date

6   to cure her default. She thus failed to comply with her obligation to pay the outstanding balance,

7   prompting Defendants to record a Notice of Default. (Lui-Kwan Decl., Ex. 1 ¶ 22 ("If Lender

8   invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the

9   occurrence of an event of default and of Lender's election to cause the Property to be sold.").)

### 2.     ReconTrust Properly Recorded A Notice Of Default And Notice Of Trustee's Sale

12          According to the Deed of Trust, "[i]f the default is not cured on or before the date

13   specified in the notice, Lender at its option may require immediate payment in full of all sums

14   secured by this Security Instrument without further demand and may invoke the power of sale and

15   any other remedies permitted by Applicable Law." (Lui-Kwan Decl., Ex. 1 ¶ 22.) Plaintiff

16   claims that Defendants failed to comply with this requirement. (FAC ¶¶ 31-33, 59-65.) For six

17   reasons, she is wrong.

### a.     ReconTrust Properly Recorded The Notice Of Default In Its Capacity As Agent For The Beneficiary

20          Plaintiff alleges that AWL "is the Lender and [the] only party entitled to enforce the Note

21   and any security interest with it" because only AWL is identified on the Note and Deed of Trust.

22   (FAC ¶ 59.) In other words, according to Plaintiff, ReconTrust cannot enforce the Note because

23   it "is not listed anywhere in the Deed of Trust or Promissory Note." (*Id.* ¶ 60; *see also id.* ¶ 27(a)

---

[3] Countrywide was empowered by the Deed of Trust to comply with these requirements on behalf of AWL or its successors/assigns. The Deed of Trust states that as the loan servicer, Countrywide "collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law." (Lui-Kwan Decl., Ex. 1 ¶ 20.) Plaintiff's FAC does not dispute that Countrywide was the loan servicer, that it was allowed to send the Notice of Intent to Plaintiff, or that it was allowed to engage in other mortgage loan servicing obligations in connection with the Loan.

1    (alleging that foreclosure process was defective because "the Trustee is not empowered to

2    conduct a sale" of the Property).)  Plaintiff is wrong.

3         The problem for Plaintiff is that AWL, the lender, was not the only entity allowed to

4    enforce the Note.  Under California law, "Civil Code sections 2924 through 2924k provide a

5    comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power

6    of sale contained in a deed of trust."  *Moeller v. Lien*, 25 Cal.App.4th 822 (1994).  Section 2924

7    allows "the trustee, mortgagee, or *beneficiary*" to file and record a notice of default, and begin the

8    foreclosure process following Plaintiff's default.  Cal. Civ. Code § 2924(a)(1) (emphasis added).

9         In this case, the Notice of Default was recorded by ReconTrust on January 28, 2009 "as

10   agent for the *Beneficiary*", *i.e.*, MERS.  (Lui-Kwan Decl., Ex. 4 (emphasis added); *see also* Tapia

11   Decl. ¶¶ 3-4.)  The Notice of Default informed Plaintiff of her default, and that she was behind in

12   her monthly payments by $79,555.75 as of January 27, 2009.  (Lui-Kwan Decl., Ex. 4.)  Thus, the

13   Notice of Default was properly recorded by ReconTrust as the agent of the beneficiary explicitly

14   named in the Deed of Trust.  *See* Cal. Civ. Code § 2924(a)(1).

   **b.    ReconTrust Properly Recorded The Notice of Trustee's Sale In**
15 **         Its Capacity As Trustee**

16

17        Under the Civil Code, the trustee must wait for three months after the notice of default is

18   recorded before recording a notice of trustee's sale.  *See* Cal. Civ. Code § 2924(a)(3) ("the

19   mortgagee, trustee or other person authorized to take the sale shall give notice of sale" only "after

20   the lapse of the three months [from the filing of a notice of default]").  In this case, the trustee

21   waited until May 4, 2009 before recording the Notice of Trustee's Sale, *i.e.*, more than three

22   months after the Notice of Default was recorded on January 28, 2009.

23        On February 2, 2009 (*i.e.*, after Plaintiff's default and before the anticipated trustee's

24   sale), MERS signed a notarized "Substitution of Trustee", which was recorded with the

25   Recorder's Office.  (Tapia Decl. ¶¶ 5-7, 9); *see also* Cal. Civ. Code § 2934a(d) ("A trustee named

26   in a recorded substitution of trustee shall be deemed to be authorized to act as the trustee under

27   the mortgage or deed of trust for all purposes from the date the substitution is executed by the

28

1  mortgagee, beneficiaries, or by their authorized agents.").  The substitution shows that the initial

2  trustee (CTC) had been replaced by a new trustee (ReconTrust).  (Lui-Kwan Decl., Ex. 5.)

3    On April 29, 2009, ReconTrust (as the trustee) posted the Notice of Trustee's Sale in

4  compliance with the Civil Code.  In particular, Section 2924f(b)(1) requires that at least 20 days

5  before the sale date, a written notice must be posted or published: (1) "on a door of the

6  residence"; (2) in a "public place"; and (3) "once a week for three consecutive calendar weeks,

7  the first publication to be at least 20 days before the date of sale, in a newspaper of general

8  circulation" in the city where the property is located.  Cal. Civ. Code § 2924f(b)(1).

9    ReconTrust complied with these requirements by posting the Notice of Trustee's Sale on

10  the front door of the Property and in a public place on April 29, 2009, *i.e.*, more than 20 days

11  before the scheduled May 20, 2009 sale date.  (Tapia Dec., Ex. C; *id.* ¶ 8.)  In addition,

12  ReconTrust published the notice in *The Salinas Californian* newspaper, a "newspaper of general

13  circulation" in Salinas, on April 29, May 6, and May 13, 2009, *i.e.*, "once a week for three

14  consecutive calendar weeks, the first publication to be at least 20 days" before the May 20, 2009

15  trustee's sale date.  (*Id.*, Ex. F.)

16    Section 2924f(b)(1) also states that a notice of trustee's sale must identify "the time of

17  sale[,] . . . the street address and the specific place at the street address where the sale" is to be

18  held.  Cal. Civ. Code § 2924f(b)(1).  Here, the Notice of Trustee's Sale specifically indicates that

19  the sale was scheduled to take place at the following date, time, and location:

20  05/20/2009 at 10:00 AM, At the front of the main entrance of the Administration Building located at
21  168 W. Alisal Street, Salinas, CA 93901.

22  (Lui-Kwan Decl., Ex. 6.)

23    Finally, on May 4, 2009, more than three months after the Notice of Default was recorded

24  on January 28, 2009, ReconTrust (as the trustee) recorded the Notice of Trustee's Sale with the

25  Recorder's Office.  (*Id.* ¶ 10.)

26    In performing these tasks, ReconTrust complied with its obligations to post and publish

27  the notice under Section 2924f(b)(1), and to wait for at least three months from the date the

28  Notice of Default was recorded before recording the Notice of Trustee's Sale under Section

2924(a)(3).  Put another way, the Notice of Trustee's Sale was recorded with the Recorder's Office in the proper manner by the proper party at the proper time.  *See Nguyen v. Calhoun*, 105 Cal.App.4th 428, 440 (2003) ("In a nonjudicial foreclosure, also known as a 'trustee's sale,' the trustee exercises the power of sale given by the deed of trust.").

### c.   The Deed Of Trust Allows MERS, As The Beneficiary, To Substitute The Trustee On The Loan

Plaintiff argues that MERS was not allowed to substitute a trustee under the Deed of Trust because it was not the lender.  (*See* FAC ¶¶ 32-33, 59-64.)  But as the beneficiary, MERS was allowed to substitute the trustee.  Civil Code Section 2934a specifically authorizes the beneficiary to execute a substitution of trustee, even if a deed of trust contains a "contrary provision":

> The trustee under a trust deed upon real property . . . given to secure an obligation to pay money and conferring no other duties upon the trustee than those which are incidental to the exercise of the power of sale therein conferred, *may be substituted by the recording in the county in which the property is located of a substitution executed and acknowledged by . . . all of the beneficiaries under the trust deed*, or their successors in interest, and the substitution shall be effective *notwithstanding any contrary provision in any trust deed* executed on or after January 1, 1968 . . . .

Cal. Civ. Code § 2934a(a)(1) (emphasis added).  Thus, although paragraph 24 of the Deed of Trust identifies the lender as the party that may appoint a successor trustee, the beneficiary in this case (*i.e.*, MERS) "possessed the power of sale upon default, which it could transfer to a trustee." *Reynoso v. Paul Financial, LLC*, 2009 WL 3833298, at *2 (N.D. Cal. Nov. 16, 2009).

Plaintiff's counsel, Michael P. Rooney, knows full well that this argument is not warranted by existing law, as he has already litigated and lost in this District on this same point. In *Reynoso*, for instance, Mr. Rooney argued that "Paul Financial, as the lender, was the only party granted the power of sale." *Reynoso*, 2009 WL 3833298, at *2.  The Honorable Judge Samuel Conti explained that Mr. Rooney's contention "is plainly false" because under California law, "[t]he beneficiary is free to make a substitution of the trustee in order to conduct the foreclosure sale." *Id.* at *2 (citing Cal. Civ. Code §§ 2934a, 2924b(b)(4)).  The "power of sale" theory that Plaintiff's counsel offered in *Reynoso* is no different than the "power of sale" theory offered in the boilerplate complaint here, and should be rejected as "plainly false".

**d.      The Notice of Default Contained The Correct Dates And Was The Same Notice Served Upon Plaintiff**

The FAC alleges that the Notice of Default did not comply with Civil Code Section 2923.5 because "the dates are all wrong" and because it was not the same notice that was served on Plaintiff.  (FAC ¶ 31.)  These two contentions are false.

First, the various dates identified on the Notice of Default are correct.  To start with, the Notice of Default states that ReconTrust "is acting as an agent for the Beneficiary under a Deed of Trust dated 1/04/2006" and that the Deed of Trust was "recorded 01/20/2006" with the Recorder's Office.  (Lui-Kwan Decl., Ex. 4.)  As the documents prove, the Deed of Trust is dated January 4, 2006, and was recorded on January 20, 2006.

Similarly, the Notice of Default states that Plaintiff's default was based on her failure to pay amounts that "became due on 05/01/2008" and that "the entire principal amount will become due on 02/01/2036 as a result of the maturity of the obligation on that date."  (*Id.*)   These dates are accurate, as corroborated by other documents.  In its June 16, 2008 and November 21, 2008 letters, for instance, Countrywide informed Plaintiff that her "loan is in serious default" because she failed to make payments that were due on May 1, 2008.  (Merziotis Decl., Exs. K, M.)  Further, according to the Deed of Trust, which Plaintiff signed, the entire principal amount owed on the Loan was set to become due on February 1, 2036.  (Lui-Kwan Decl., Ex. 1.)  Accordingly, these dates were also correct.

The only remaining date identified in the Notice of Default is January 27, 2009, the date the notice was signed.  According to the notice, Plaintiff owed "$79,555.75, as of 1/27/2009 and will increase until your account becomes current."  (*Id.*, Ex. 4.)  Plaintiff likely did not intend to challenge this January 27, 2009 date; but even if she did, she cannot credibly dispute that the notice was dated on January 27, 2009 (or that it was recorded the next day, January 28, 2009).  Plaintiff's contention that the "the dates are all wrong" is therefore false.  (FAC ¶ 31.)

Second, Plaintiff alleges that the Notice of Default that was recorded is not the same notice that was served upon her.  (FAC ¶ 31.)  The evidence proves that this contention is also wrong.  On February 26, 2009, Plaintiff's broker sent a 21-page fax to Countrywide regarding a

proposed short sale.  *See supra* § II(C); (Merziotis Decl., Ex. N).  The fax includes a copy of the Notice of Default, which Plaintiff appears to have delivered to her broker.  The copy of the notice that she delivered to her broker contains the exact same dates, amounts, and narrative text as the notice that was recorded with the Recorder's Office.  (*Compare* Merziotis Decl., Ex. N *with* Lui-Kwan Decl., Ex. 4.)  Thus, Plaintiff cannot credibly argue that the Notice that was recorded is different than the copy served upon her.

> **e.**       **Defendants Complied With Civil Code Section 2923.5**

Plaintiff claims that the Notice of Default was defective because Defendants "failed to make the required contact under Civil Code § 2923.5."  (FAC ¶ 31; *see also id.* ¶ 65.)  Like so many of her other contentions, this too is false.

Section 2923.5(b) states: "A notice of default filed pursuant to Section 2924 shall include a declaration from the mortgagee, beneficiary, or authorized agent that it has contacted the borrower, tried with due diligence to contact the borrower as required by this section, or the borrower has surrendered the property to the mortgagee, trustee, beneficiary, or authorized agent."  Cal. Civ. Code § 2923.5(b).  The statute therefore requires the foreclosing lender to provide a declaration stating only that it has tried to contact the borrower.  *See id.*

Pursuant to Section 2923.5, Countrywide attached a declaration with the Notice of Default ("Section 2923.5 Declaration").  The Section 2923.5 Declaration was signed under penalty of perjury by Mandelyn Wyrick, a loss mitigation review specialist at Countrywide.  The declaration states that "Countrywide tried with due diligence to contact the borrower in accordance with California Civil Code Section 2923.5."  (Lui-Kwan Decl., Ex. 4.)

As the documents show, Ms. Wyrick's Section 2923.5 Declaration was accurate.  As discussed above, Countrywide sent a letter dated September 16, 2008 to Plaintiff explicitly stating that it was trying to contact Plaintiff pursuant to the statute:

> **IMPORTANT MESSAGE ABOUT YOUR LOAN**
> This letter is being sent pursuant to California Code section 2923.5.  Countrywide realizes that sometimes things happen that are out of your control, which can keep you from meeting your most important financial obligations.  We would like to talk to you about your current loan situation to determine if you qualify for one of Countrywide's workout options,

(Merziotis Decl., Ex. L.)

Plaintiff received the September 26, 2008 letter and gave it to her broker.  The broker then sent the letter back to Countrywide when he sent the February 26, 2009 21-page fax requesting a short sale.  (*Id.*, Ex. N.)  Plaintiff also cannot dispute that she and her ex-husband (who was also a party to the Deed of Trust) were contacted multiple times by Countrywide between the May 1, 2008 date of Plaintiff's default and the January 21, 2009 date of Ms. Wyrick's Section 2923.5 Declaration.  (*See, e.g., id.*, Exs. N, P-Q.)  Accordingly, Plaintiff's contention that Defendants "failed to make the required contact under Civil Code § 2923.5" is wrong.  (FAC ¶ 31.)

### f.   Ms. Elizavet Meza Properly Executed The Substitution Of Trustee On Behalf Of MERS

Plaintiff contends that the Substitution of Trustee (Lui-Kwan Decl., Ex. 5) was defective as it was signed by "Elisavet Meza[,]" who Plaintiff claims "is not truly an assistant secretary for MERS, but rather an employee of Recon Trust [*sic*] and her signature on documents purporting to act on MERS's behalf amounts to real estate fraud."  (FAC ¶ 36.)  Plaintiff is wrong.

As Plaintiff admits, Ms. Meza was an employee of ReconTrust when she signed the Substitution of Trustee on February 2, 2009.  (Lui-Kwan Decl., Ex. 5; FAC ¶ 36.)  However, on August 3, 2007, MERS' Board of Directors appointed Ms. Meza and other ReconTrust employees as "assistant secretaries of MERS":

> Be it Resolved that all employees of **ReconTrust Company,** a subsidiary of Countrywide Financial Corporation and a Member of Mortgage Electronic Registration Systems, Inc. (MERS), and are hereby appointed as assistant secretaries of MERS. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Merziotis Decl., Ex. R.)

As an assistant secretary, Ms. Meza was expressly authorized to execute substitution of trustee forms on behalf of MERS:

> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Assistant Secretaries and vice presidents of MERS, as such, are authorized to:
>
> (3) execute any and all documents necessary to foreclose upon the property securing any mortgage loan registered on the MERS System that is shown to be registered to the Member, including but not limited to (a) substitution of trustee on Deeds of Trust, (b) Trustee's Deeds upon sale on behalf of MERS, (c) Affidavits of Non-military Status, (d) Affidavits of Judgment, (e) Affidavits of Debt, (f) quitclaim deeds, (g) Affidavits regarding lost promissory notes, and (h) endorsements of promissory notes to VA or HUD on behalf of MERS as a required part of the claims process;

(*Id.*)

Thus, when Ms. Meza signed the Substitution of Trustee before a notary on February 2, 2009, long after the MERS Board approved her appointment on August 3, 2007, she was empowered to (and did) sign it as an "Assistant Secretary" of MERS:



(Lui-Kwan Decl., Ex. 5.)  Accordingly, Plaintiff's contention that MERS or ReconTrust engaged in "real estate fraud" by allowing Ms. Meza to sign the Substitution of Trustee is patently false. (FAC ¶ 36.)

**B.**     **Defendants Are Not Required To Possess Or Produce The Original Promissory Note Before Commencing Foreclosure Because The UCC Does Not Apply To Nonjudicial Foreclosures In California**

Plaintiff alleges that Defendants may not foreclose upon the Property until they demonstrate that the beneficiary possesses the original promissory note by producing the note to her.  (*See*, *e.g.*, FAC ¶¶ 68-80.)  For three reasons, Plaintiff is wrong: (1) the "produce the note" theory is not recognized in California; (2) the UCC, upon which the theory is based, does not apply in the context of nonjudicial foreclosures; and (3) in any event, defendant BNY has physical possession of the original note.

**1.**     **California Courts Do Not Recognize The "Produce The Note" Theory**

Plaintiff's argument is based on a misunderstanding of the law.  The "produce the note" theory spawned in Florida and, over the last year, has been discussed in detail on cable news channels and in certain newspapers.  Those stories, however, do not describe the requirements under California law.

Under California law, possession of the original note is not a prerequisite to foreclosure. *See Putkkuri v. ReconTrust Co.*, 2009 WL 32567, at *2 (S.D. Cal. Jan. 5, 2009) ("Pursuant to section 2924(a)(1) of the California Civil Code, the trustee of a Deed of Trust has the right to initiate the foreclosure process. . . .  Production of the original note is not required to proceed with a non-judicial foreclosure."); *Candelo v. NDex West, LLC*, 2008 WL 5382259, at *4 (E.D. Cal.

Dec. 23, 2008) ("No requirement exists under the statutory framework to produce the original note to initiate non-judicial foreclosure."); *San Diego Home Solutions, Inc. v. ReconTrust Co.*, 2008 WL 5209972, at *2 (S.D. Cal. Dec. 10, 2008) ("California law does not require that the original note be in the possession of the party initiating non-judicial foreclosure."); *Tina v. Countrywide*, 2008 WL 4790906, at *8 (S.D. Cal. Oct. 30, 2008) ("Cal. Civ. Code § 2924 outlines the requirements for nonjudicial foreclosures in California, and does not include providing the original note prior to the sale."); *Neal v. Juarez*, 2007 WL 2140640, at *8 (S.D. Cal. July 23, 2007) (an "allegation that the trustee did not have the original note or had not received it is insufficient to render the foreclosure proceeding invalid"). Simply put, a lender does not need to produce the original promissory note to foreclose in California.

### 2.    The UCC Does Not Apply To Nonjudicial Foreclosures

To the extent Plaintiff is claiming that the promissory note is a negotiable instrument, and must therefore be enforced by the note holder pursuant to the Uniform Commercial Code ("UCC"), she is wrong. The UCC governs negotiable instruments; it does not govern nonjudicial foreclosure under deeds of trust.

The rules governing nonjudicial foreclosure of a deed of trust are set forth in the Civil Code beginning at Section 2924. California courts have repeatedly held that these provisions establish a "comprehensive" and "exclusive" set of regulations for the conduct of non-judicial foreclosures. *Moeller*, 25 Cal.App.4th at 834 ("The comprehensive statutory framework established to govern nonjudicial foreclosure sales is intended to be exhaustive."); *I.E. Assocs. v. Safeco Title Ins. Co.*, 39 Cal.3d 281, 285 (1985) ("The statutory provisions regulating the nonjudicial foreclosure of deeds of trust are contained in sections 2924-2924i. These provisions cover every aspect of exercise of the power of sale contained in a deed of trust.").

Because the Civil Code provides the "comprehensive" and "exclusive" rules governing nonjudicial foreclosures, the UCC does not play any role in the foreclosure process. *See*, *e.g.*, *Farahani v. Cal-Western Reconveyance Corp.*, 2009 WL 1309732, at *2 (N.D. Cal. May 8, 2009) ("The case law cited by Plaintiff that purportedly applies the Commercial Code to transfer of a deed is inapposite, as those cases do not involve foreclosure of residential property. While

Commercial Code § 3301 arguably requires that the foreclosing party have possession of the underlying deed or note, such possession is not required for a non-judicial foreclosure."); *Smith v. Wachovia*, 2009 WL 1948829, at *3 (N.D. Cal. July 6, 2009) ("Plaintiff is incorrect that the UCC is the governing law in this matter. . . . The non-judicial foreclosure process is covered exclusively by section 2924 of the California Civil Code.").[4]

That state and federal courts in California have soundly rejected this theory is not news to Plaintiff's counsel, Mr. Rooney. Mr. Rooney has already litigated and lost in this District on this very same point. *See Reynoso*, 2009 WL 3833298, at *4. In *Reynoso*, as in this case, Mr. Rooney argued that "the promissory note is a negotiable instrument, and must therefore be enforced by the note holder pursuant to section 3301 of the California Commercial Code." *Id.* Judge Conti disagreed, explaining that Mr. Rooney's attempt to import the UCC's rules into the Civil Code's framework "must fail" because "[i]t would be inconsistent with the comprehensive and statutory scheme regulating nonjudicial foreclosures to incorporate another unrelated cure provision into statutory nonjudicial foreclosure proceedings." *Id.* (quoting *Moeller*, 25 Cal.App.4th at 834).

The overwhelming weight of authority on this point is clear—the UCC does not apply to nonjudicial foreclosures. As such, Defendants have no obligation to produce the original promissory note before commencing foreclosure.

### 3. The Bank Of New York Mellon Possesses The Original Note

Even if this case were proceeding under Florida law (it is not), or the UCC applied (it does not), Plaintiff's attempt to stall foreclosure by demanding the original promissory note would fail for the additional reason that the Bank of New York has physical possession of the note.

As set forth in the Declaration of Michael Cerchio ("Cerchio Decl."), BNY is the trustee for a trust known as "CHL Mortgage Pass-Through Trust 2006-HYB4" ("Trust"). (Cerchio Decl.

---

[4] *See also Castaneda v. Saxon Mortg. Services, Inc.*, --- F.Supp.2d ----, 2009 WL 4640673, at *7 (E.D. Cal. Dec. 3, 2009) (rejecting argument that defendants "were not in possession of the Note, and are not beneficiaries, assignees or employees of the entity in possession of the note, and are therefore not 'person[s] entitled to enforce' the security interest on the property in accordance with section 3301" because "section 3301 reflects California's adoption of the Uniform Commercial Code, and does not govern non-judicial foreclosures, which is governed by California Civil Code section 2924"); *Gaitan v. Mortgage Electronic Registration Sys.*, 2009 WL 3244729, at *10 (C.D. Cal. Oct. 5, 2009) ("Non-judicial foreclosure in California is not governed by [Cal. Com. Code §§ 3301, 3309], but rather by Cal. Civ. Code §§ 2924, *et seq.*").

¶ 2.)  The assets of the Trust consist primarily of a pool of mortgage loans secured by first liens on one- to four-family residential properties, including the Loan at issue in this case.  (*Id.* ¶¶ 2-5.) BNY took physical possession of the original Note on or about May 25, 2006.  (*Id.* ¶ 6.)  BNY has had continuous physical possession of the original Note since that time, and stores the Note at its offices in Cypress, California.[5]  (*Id.*)

Plaintiff alleges that Defendants, including BNY, were not "entitled by law in this State to initiate foreclosure under the security instrument" (FAC ¶ 21) and had "no right to initiate foreclosure under the security instrument" (*id.* ¶ 22) because none of them possessed the original Note.  These allegations are unsupported nonsense.  As set forth above, California law does not require physical possession of the original Note.  And even if it did, Plaintiff would not be able to create a genuine issue of material fact in any event because the Note is in the physical possession of defendant BNY.  Accordingly, Defendants are entitled to summary judgment against Plaintiff.

## C.   Plaintiff's Miscellaneous Challenges To The Foreclosure Process Are Wrong

Plaintiff challenges the propriety of the foreclosure process by alleging that unspecified "Defendants" engaged in various forms of misconduct.  In particular, Plaintiff claims that these "Defendants": (1) "intentionally placed Plaintiff in a sub-prime loan to the benefit of the Defendants with excessively high interest rates"; (2) "failed to provide Plaintiff mandated disclosures"; and (3) "repeatedly employed coercive tactics to force Plaintiff to sign the loan documents."  (FAC ¶ 81.)  The evidence shows that Plaintiff is wrong on all three counts.

First, Plaintiff does not (and cannot) show that Defendants "intentionally" gave her a "sub-prime loan" with "excessively high interest rates."  (*Id.*)  Plaintiff applied for the Loan herself, could have walked away from the transaction before she signed, and was not under any obligation to accept the Loan terms.  (Merziotis Decl., Ex. A.)  Indeed, as the documents show, Plaintiff is a savvy real-estate investor who had been through the mortgage process several times

---

[5] The Trust purchased the Loan pursuant to a May 1, 2006 pooling and servicing agreement ("PSA").  (Cerchio Decl. ¶ 3.)  The parties to the PSA include: CWMBS, Inc., a Delaware corporation that purchased loans (including the Loan at issue) from Countrywide Home Loans, Inc. and other sellers affiliated with Countrywide Financial Corp. ("Sellers"); the Sellers of the loans; Countrywide Home Loans Servicing LP (as master servicer to the loans); and BNY (as trustee).  (*Id.*)  On or about May 25, 2006, the original Note was delivered to BNY, as custodian, pursuant to the PSA.  (*Id.* ¶ 6.)

before and fully understood the terms of the Loan.  When she applied for the Loan, she owned a separate fully paid property that she used to generate $2,200 of rental income each month, she had two preexisting loans secured by the Property at issue (which she refinanced using the Loan proceeds), she used the Loan to strip more than $400,000 in cash from the Property, and she later obtained a HELOC secured by the Property, giving her another $300,000 in the form of a revolving credit line.  (*Id.*; Lui-Kwan Decl., Exs. 1-2.)  Thus, the notion that Plaintiff fell victim to a "sub-prime loan" that was somehow imposed upon her is nonsense.

Further, it would have been impossible for Plaintiff to have suffered harm as a result of "high interest rates" for two reasons.  (FAC ¶ 81.)  To start with, her rate was set at 6.500% for the first seven years, *i.e.*, from March 1, 2006 to February 1, 2013.  (Merziotis Decl., Ex. F.)  Because she defaulted on May 1, 2008, more than four years before her rate was scheduled to adjust, she was still subject to the favorable 6.500% that she agreed to pay at origination.  In addition, even if the rate had been adjusted on May 1, 2008, when Plaintiff defaulted, her rate would have been *lower* than the initial 6.500% rate.  Under the Note, new interest rates are calculated by adding 2.250% to the one-year LIBOR rate published by The Wall Street Journal ("LIBOR Rate").  (*Id.*)  As of May 1, 2008, the LIBOR Rate was 2.98375%.  (Lui-Kwan Decl., Ex. 7.)  Thus, even if Plaintiff's rate had been adjusted, it would have been the sum of 2.98375% and 2.250%, or 5.23375%.  In other words, if the Loan had been adjusted around the time Plaintiff defaulted, her interest rate would have been reduced.  She therefore could not have suffered any harm from "high interest rates".  (FAC ¶ 81.)

Second, Plaintiff does not explain what "mandated disclosures" were withheld from her.  (*Id.*)  The reason she does not identify any such disclosures is because she cannot.  Indeed, as set forth above, the evidence shows that she acknowledged in writing that she received the disclosures at the time of origination.  (*See supra* § II(A); Merziotis Decl., Exs. B-E.)[6]

---

[6] Further, in the event Plaintiff is seeking rescission or damages under the Truth in Lending Act ("TILA") because unspecified "disclosures" were withheld from her in January 2006, her claim would fail for the simple reason that it is time-barred.  She filed her action in Superior Court in August 2009, long after the end of the one-year statutory period for TILA damages and three-year statutory period for rescission.  *See, e.g.*, *Runaj v. Wells Fargo Bank*, --- F.Supp.2d ----, 2009 WL 3234182, at *7 (S.D. Cal. Sept. 30, 2009) (dismissing TILA damages claim as barred by one-year statute of limitations and TILA rescission claim as barred by three-year statute of limitations).

Third, Plaintiff's contention that Defendants "repeatedly employed coercive tactics to force Plaintiff to sign the loan documents" is belied by the facts.  (FAC ¶ 81.)  There are no allegations or documents showing that Defendants engaged in any "coercive" misconduct.  The reason there are no such allegations or documents is that it would be impossible for Plaintiff to credibly suggest that she was coerced into signing a loan that left her with $421,447.00 in cash after her prior loans and expenses were paid.  (*See supra* § II(A); Merziotis Decl., Ex. A.)

Because there is no genuine issue as to any of these three challenges, summary judgment should be entered in Defendants' favor.

## IV.  PLAINTIFF CANNOT STATE A CLAIM AS A MATTER OF LAW

At the January 14, 2010 hearing on Defendants' motion to dismiss ("Motion"), the Court expressly declined to rule on the merits of the Motion.  To the extent the Court's order on Defendants' motion for summary judgment does not result in a dismissal of claims asserted in Plaintiff's FAC, Defendants respectfully request that the Court rule on the merits of the Motion.

In particular, Plaintiff's FAC is legally defective for three fundamental reasons.  First, she lacks standing to pursue any of her claims because she has not complied with California's tender rule.  *See Pantoja v. Countrywide Home Loans, Inc.*, 640 F.Supp.2d 1177, 1183 (N.D. Cal. 2009) ("Under California law, in an action to set aside a trustee's sale, a plaintiff must demonstrate that he has made a 'valid and viable tender [offer] of payment of the indebtedness.'") (quoting *Karlsen v. American Sav. & Loan Ass'n*, 92 Cal.Rptr. 851, 854 (1971)); (Motion at 3-5).

Second, even if Plaintiff could identify a procedural defect in the foreclosure process (she cannot), she has not shown that she was prejudiced, if at all, by Defendants' purported failure to comply with the Deed of Trust or California law.  *See Knapp v. Doherty*, 123 Cal.App.4th 76, 92 (2004) (sale not invalidated where procedural defect was not prejudicial); *Moore v. Chase Bank*, 2008 WL 961161, at *4 (N.D. Cal. Apr. 7, 2008) ("Without even an allegation of prejudice, the Court will not intervene based on what may be, at most, a technicality."); (Motion at 8-9).

Third, Plaintiff's FAC fails for the simple reason that it does not plead facts sufficient to state a claim under any theory.  *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1940 (2009) ("the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a

cause of action's elements, supported by mere conclusory statements"); (Motion at 5-16). Because Plaintiff does not (and cannot) plead such facts in compliance with Federal Rules 8 and 9(b), her FAC should be dismissed with prejudice.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court enter judgment in their favor as to each of Plaintiff's claims.

DATED: January 28, 2010

Respectfully submitted,

SEVERSON & WERSON
A Professional Corporation

By:   */s/ Kalama M. Lui-Kwan*
          Kalama M. Lui-Kwan

Attorneys for Defendants
Countrywide Home Loans, Inc. (d/b/a
America's Wholesale Lender), BAC Home
Loans Servicing, LP (f/k/a Countrywide
Home Loans Servicing L.P.), ReconTrust
Co., N.A., Bank of America, N.A., and
Bank of New York Mellon f/k/a The
Bank of New York as Trustee